179 Ariz. 86 (1994)
876 P.2d 1121
In the Matter of the APPEAL IN PIMA COUNTY JUVENILE SEVERANCE ACTION NO. S-114487.
The FATHER IN PIMA COUNTY JUVENILE ACTION NO. S-114487, Petitioner,
v.
Honorable Karen ADAM, Judge Pro Tem, Pima County Superior Court, State of Arizona, Respondent, and Robert FINN, Petitioner in Action No. S-114487; The Minor Child in Pima County Juvenile Action No. S-114487; The Mother in Pima County Juvenile Action No. S-114487, Real Parties in Interest, Prospective Adoptive Parents, Intervenors.
Nos. CV-93-0305-PR/SA, CV-94-0259-T/AP.
Supreme Court of Arizona, En Banc.
June 23, 1994.
*90 Amy Z. Hubbell and Streich Lang, P.A., Tucson by Robert E. Miles, Phoenix, Dianne C. Kerns, Tucson, Susan G. Boswell, Tucson, for Minor Child.
Peter W. Hochuli, Tucson, for Natural Father.
Curtis & Cunningham by George Haskel Curtis, Tucson, for Prospective Adoptive Parents, Robert Finn, Minor Child, and Natural Mother.
Grant Woods, Atty. Gen., Phoenix by Joan R. Mendelson, Tucson, Cecil B. Patterson, Jr., Phoenix, for amicus curiae Arizona Dept. of Economic Security.
Stephen D. Neely, Pima County Atty. by David M. Quantz, Tucson, for amicus curiae Pima County Attorney's Office, Division of Child Advocacy.
Ann M. Haralambie, Tucson, for amicus curiae Arizona Counsel of Attys. for Children, Inc.
Children's Legal Clinic by Shari F. Shink, Denver, for amicus curiae Children's Legal Clinic.
OPINION
FELDMAN, Chief Justice.
This case presents fundamental issues concerning grounds for severance of parental rights. The case comes to us on a petition for review filed by a guardian ad litem on behalf of a young child. The guardian argues that the trial judge erred in refusing to terminate the parental rights of the child's biological father. The guardian claims this unwed father abandoned the child and that his parental rights should therefore have been severed so that the child could be adopted. Because the issues have immediate, statewide importance, we granted review.
FACTS AND PROCEDURAL HISTORY
The child[1] is the daughter of young, unwed parents whose relationship began in 1989. The mother, the father, and their respective families live in Texas. Upon learning that their daughter was pregnant, the mother's parents sent her to stay with an aunt in Tucson. The mother came to Tucson in August 1991 and gave birth to the child on October 24, 1991, when she was only seventeen.
Before the child's birth, the mother suggested adoption, but the father opposed the idea. Nevertheless, the mother's parents pressured her to place the baby for adoption in Tucson. After delivery, the mother did so without the father's knowledge. The mother remained in Tucson for only one week, and the father did not learn of the baby's placement until the baby was already in another home. The child was placed and still lives with a couple hoping to adopt her. The adoption was never completed because of the pendency of these termination proceedings. Nevertheless, we refer to the couple as adoptive parents.
The procedural history of this case has exacerbated the present dilemma because the case comes to final resolution over two years after legal proceedings were first initiated and almost three years after the child began living and bonding with her adoptive parents. The case before us is a severance proceeding, not an adoption or custody matter. This child may be eligible for adoption only if both natural parents either voluntarily relinquish their rights, have those rights severed, or are found incompetent by a court. See A.R.S. § 8-106(A)(1).[2] In this case, only *91 the mother voluntarily relinquished her rights.
Although the father did not give up his parental rights, the child entered the adoptive parents' home a few days after birth when the mother gave them physical custody. Approximately six months later, the attorney for the adoptive parents,[3] alleging he stood in loco parentis to the child, filed a petition in juvenile court to terminate the father's parental rights. The only asserted statutory basis for termination was the father's abandonment of the child. See A.R.S. § 8-533(A).
A. The trial and appellate proceedings
The father received notice of the severance petition and responded by writing a letter to the court saying he did not wish to give up his child and hoped to raise her. The court then appointed an attorney for him and a guardian ad litem for the child. Thus, the interests of both father and child were represented at the severance hearing.
After testimony from the natural father, the paternal grandmother, and the adoptive mother, the trial court concluded that the evidence did not clearly and convincingly establish that the father intended to abandon his child.[4] Accordingly, the court held that no grounds for termination existed and refused to sever the father's parental rights. Order, Jan. 5, 1993 (hereinafter "First Order"). This, of course, made the child unavailable for adoption. See A.R.S. § 8-106(A)(1)(b).
The child appealed through her guardian ad litem, arguing that the trial court applied an improper standard for abandonment by failing to consider the child's needs and rights. The court of appeals affirmed the trial court's decision. In re Appeal in Pima County Juvenile Severance Action No. S-114487, 144 Ariz.Adv.Rep. 48, 1993 WL 276801 (Ct.App. 1993). The court of appeals held that the statutory definition of abandonment found in § 8-546 did not apply and that the settled purpose test is instead the proper standard to apply in all abandonment cases. Id.
B. Present proceedings
The child's guardian ad litem then petitioned this court for review. See Ariz.R.Civ. App.P. 23. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12-120.24.
We granted review, believing that the trial court and court of appeals might have applied the wrong standard of abandonment. After briefing and oral argument, we concluded that this, in fact, had occurred. Thus, we suspended the appeal and remanded the case to the trial court with an order that stated in relevant part:
[T]he [trial] judge adopted and applied the so-called "settled purpose" standard rather than the standard contained in A.R.S. § 8-546.
* * * * * *
This Court concludes, however, that the trial court and the Court of Appeals erred in not adopting and applying the definition of "abandoned" contained in A.R.S. § 8-546(A)(1).... This statutory standard measures abandonment much more by the parent's conduct than by subjective intent....

*92 It appears, therefore, that the facts ... were weighed by the judge under an improper legal standard and that, in finding there had been no abandonment, the trial court may have applied too stringent a test.
* * * * * *
IT IS ORDERED ... as follows:
1. The court is to schedule and reconvene an evidentiary hearing....
2. In considering the question of abandonment, the court may also consider whether the "needs of the child" were fulfilled. See A.R.S. § 8-533(B).
3. The trial court shall then make its findings on the basis of all of the evidence received by the court in the entire proceeding
....
Order, Feb. 4, 1994 (hereinafter Feb. 4 Order).[5]
As required, the trial judge reconsidered the facts, offered the parties an opportunity to present further evidence, and heard argument. After doing so, and applying the correct definition of abandonment, the judge found that the father's conduct constituted statutory abandonment. Order, Feb. 24, 1994 (hereinafter "Second Order").
As our remand order permitted, the parties then filed their objections and comments to the Second Order, together with supporting briefs. In essence, the father argues that the settled purpose standard is proper, and that even under the standard we instructed the trial court to apply on remand, the evidence does not clearly and convincingly establish abandonment. Therefore, the father claims he has been wrongfully denied the fundamental right to raise his child. Father's Objections and Comments to Findings of the Trial Court at 13 (Mar. 9, 1994) (hereinafter "Objections"). The father also argues that his due process rights have been violated because he was not appointed counsel until after the six-month statutory period of abandonment had passed. See A.R.S. § 8-546(A). The minor's guardian urges this court to affirm the Second Order.
The father also filed an original special action proceeding,[6] alleging, inter alia, that the Second Order should be vacated because the trial court exceeded its jurisdiction. The father claims that we did not authorize the trial judge to vacate the First Order and enter a new one, and he also argues that the trial judge abused her discretion in admitting transcripts of the dependency proceeding at the second hearing.[7]
*93 Finally, the father filed an appeal from the Second Order, arguing that the trial judge acted arbitrarily and capriciously. The court of appeals, correctly believing that jurisdiction of this case is vested with the Supreme Court, transferred the appeal to us. The special action petition and the appeal raise no issue not already presented by the objections. We therefore accepted jurisdiction of the special action and the appeal and consolidated them for decision with the pending proceedings.
Within this complex procedural frame-work, we now turn to the questions raised by the parties. Given the present procedural posture, we treat the father as the petitioner and his objections to the Second Order as issues raised on appeal.
DISCUSSION
A. Procedural claims
We begin with the father's procedural objections to the Second Order. First, the father argues that the trial judge should not have considered any new evidence at the second hearing and that she committed reversible error in admitting excerpts of testimony taken at the dependency hearing. We disagree. Our order to the trial judge instructed her to "reconvene an evidentiary hearing at which the court will take such additional testimony...." Feb. 4 Order at 3.
Furthermore, the testimony at the dependency hearing was relevant to the severance proceeding. The former was to determine the father's fitness to take custody. Although the burden of proof is lower in a dependency matter than in a termination matter, the trial court did not adopt dependency findings made under a preponderance of the evidence standard. The court merely admitted the relevant testimony. The trial judge then applied the clear and convincing standard to all relevant evidence, including the dependency hearing testimony, in determining abandonment. Therefore, the lower burden of proof applied in the dependency matter was not applied in the severance matter.
The father also argues that the trial court erred in terminating his parental rights under the Second Order. The father claims that we only instructed the trial court to make findings of fact and conclusions of law under the proper standard. The trial judge followed this mandate. She made findings of fact and reached the legal conclusion that the father abandoned his child. The trial judge's ability to reach the logical end result  whether to grant the petition to terminate  was implicit in our remand. The trial judge found abandonment, considered the best interests of the child, and granted the petition to sever.
Having found that the trial court made no procedural error on remand, we turn to the merits.
B. Constitutional principles
Citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972), the father argues that the "right to the control and custody of one's children ... is fundamental" and that the state cannot deprive a parent of this relationship without due process of law. Objections at 13; Petition for Special Action at 6. We agree. However, in Stanley, the state sought to terminate a close parental relationship that spanned eighteen years, solely because the parents were unmarried. Id. at 646, 92 S.Ct. at 1210; cf. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Quilloin v. Walcott, 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978). The present case involves an unwed father who, at the time of the termination proceedings, had never even seen his child.
The United States Supreme Court has held that the constitution permits states to distinguish between the rights of differently situated parents. Quilloin, 434 U.S. at 256, 98 S.Ct. at 555; see also Evans v. South Carolina Dep't of Social Servs., 303 S.C. 108, 399 S.E.2d 156, 157 (1990) (statute providing that only certain classes of unwed fathers may withhold consent to adoption is constitutional). The distinction is central to this case. Although parents with an existing parental relationship, either in fact or law, are entitled to the highest constitutional protection, *94 an unwed father must first take steps to establish a parent-child relationship before he may attain the same protection. Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 1768, 60 L.Ed.2d 297 (1979) ("where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause" provides him the right to veto an adoption); see also In re Adoption of Doe, 543 So.2d 741, 749 (Fla. 1989) (unwed father not entitled to veto adoption where he knew of pregnancy, yet made no attempt to assist in any way), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989); In re Adoption of Baby Boy D, 742 P.2d 1059, 1068 (Okla. 1985), cert. denied, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988) (same). While the state may not unduly interfere with an unwed father's ability to develop this relationship, it need not protect the mere biological link that exists if the father fails to step forward. Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983); see also Elizabeth Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson (hereinafter Buchanan, Constitutional Rights), 45 OHIO ST.L.J. 313, 354, 373 (1984).[8]
One reason for the distinction is that an unwed father has limited immediate parental responsibilities. See Karen Czapanskiy, Volunteers & Draftees: The Struggle for Parental Equality, 38 UCLA L.REV. 1415, 1417 (1991). Other parents' rights and responsibilities relating to their child begin at birth, or before, and primarily relate to custody and support, which automatically vest in birth mothers and married fathers. Id. at 1420 ("It is hard to imagine a court saying that a birth mother has an `opportunity' to develop a relationship with her child; instead, she bears a responsibility to do so."); see also Quilloin, 434 U.S. at 256, 98 S.Ct. at 555 ("legal custody of children is, of course, a central aspect of the marital relationship"). Because of these immediate ties, our state and federal constitutions strongly protect those relationships. Lehr, 463 U.S. at 257-58, 103 S.Ct. at 2991 (discussing the linkage between parental duty and parental rights). An unwed father, on the other hand, has no immediate right to custody and no corresponding, legally enforceable responsibility to provide support unless paternity is judicially established. See A.R.S. §§ 12-849 and 25-331(C). Thus, an unwed father's parental rights do not attain fundamental constitutional status unless he takes significant steps to create a parental relationship.
With these constitutional principles in mind,[9] we turn to abandonment, the sole *95 ground asserted for terminating this father's parental rights.
C. The trial court's application of the termination statute
1. The termination statute
Termination of parental rights is governed solely by A.R.S. § 8-533. Abandonment is one of the enumerated grounds for termination.[10] Although this statute leaves abandonment undefined, § 8-546, in the same chapter, defines abandonment and applies the definition to all sections within the chapter. We conclude, therefore, that the court of appeals incorrectly held that the § 8-546 abandonment definition does not apply to § 8-533. Pima County Juvenile No. S-114487, 144 Ariz.Adv.Rep. at 49, 1993 WL 276801.
Abandonment is defined in § 8-546(1) as:
[T]he failure of the parent to provide reasonable support and to maintain regular contact with the child, including the providing of normal supervision, when such failure is accompanied by an intention on the part of the parent to permit such condition to continue for an indefinite period in the future. Failure to maintain a normal parental relationship with the child without just cause for a period of six months shall constitute prima facie evidence of abandonment.
Our courts have generally not applied this statutory definition to termination proceedings, resorting instead to a common-law definition. Over the years, in trying to clarify abandonment by addressing intent and conduct, our courts have adopted two tests: settled purpose and conscious disregard.[11] The settled purpose doctrine focuses on parental intent and has been defined as:
[C]lear and convincing evidence of intentional conduct on the part of a parent that evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.
In re Appeal in Maricopa County Juvenile Action No. JS-500274, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990) (emphasis added). Although the quoted language was probably dicta, it closely follows the language of our holding in In re Appeal in Pima County Severance No. S-1607, 147 Ariz. 237, 238, 709 P.2d 871, 872 (1985). Neither case, however, involved an unwed father who had never even seen his child. Rather, both cases concerned parental relationships that had matured or existed through marriage.
Other courts have applied a conscious disregard test that addresses the parent's conduct, intentional or not, and its impact on the child in determining whether parental rights should be terminated. The conscious disregard test looks at:

*96 [C]onduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to his child, leading to the destruction of the parent-child relationship.

In re Appeal in Pima County Juvenile Action No. S-1182, 136 Ariz. 432, 433, 666 P.2d 532, 533 (Ct.App. 1983) (emphasis added). These two concepts have been variously applied, often in the same case.[12]
As the father argues, the conscious disregard test cannot be applied because here he could not form a parent-child relationship, let alone disregard it. And if the settled purpose doctrine applies, then no grounds for termination exist because the trial judge specifically found that "[i]n this case, that purpose cannot be found." First Order at 1 (emphasis added). The father accurately points out that no evidence rebutting the factual basis for this conclusion was presented at the second hearing.
We believe, however, that in cases such as this one, abandonment cannot turn on a bright line formula developed to determine whether a parent abandoned an existing relationship. In this case, the father had assumed no parental duties and no parental relationship had come into existence. There was, in short, nothing to relinquish. The key to this case is the statute defining abandonment, which we apply in common-sense terms, with its meaning in this factual context derived from Quilloin and Lehr.[13]
Abandonment is defined by § 8-546(A)(1) as the "failure ... to provide reasonable support and to maintain regular contact ..., including ... normal supervision, when such failure is accompanied by an intention on the part of the parent to permit such condition to continue for an indefinite period in the future." What constitutes reasonable support, regular contact, and normal supervision varies from case to case. It is often difficult, as in the present case, for the unwed father to provide support or supervision, or to even maintain contact. Nonetheless, the father must take concrete steps to establish the legal or emotional bonds linking parent and child. This is Lehr's message.
2. The Lehr principle
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship....
Lehr, 463 U.S. at 261-62, 103 S.Ct. at 2993. In defining the father's liberty interest, the Court characterized "the rights of the parents [as] a counterpart of the responsibilities they have assumed." Id. at 257, 103 S.Ct. at 2991.
Only if paternity is legally established and the unwed father seeks custody does he have the right to provide emotional support and receive the corresponding benefits of a parental relationship. See A.R.S. § 25-331(C). Thus, because the unwed father has no immediate and obvious legal ties to the child, he must act to establish his parent-child relationship.
Lehr, and cases interpreting it, provides insight into the important conduct under § 8-533. The father's immediate and persistent actions are central. See In re Appeal of H.R., 581 A.2d 1141, 1160 (D.C.Ct. *97 App. 1990) (lead opinion); Wade v. Geren, 743 P.2d 1070 (Okla. 1987). "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by `com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the Due Process Clause." Lehr, 463 U.S. at 261, 103 S.Ct. at 2993 (quoting Caban, 441 U.S. at 392, 99 S.Ct. at 1768).
Thus, in whatever manner we apply the statute's language to termination proceedings against an unwed father with no parental relationship, the message, put simply, is this: do something, because conduct speaks louder than words or subjective intent.[14] When, as in the present case, circumstances prevent the unwed father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary. In re Raquel Marie X, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, 428 (1990) ("the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child  not merely to block adoption by others"), cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 528 (1990). Only then is a biological link transformed into a parental relationship deserving full constitutional protection.
Although these tests may be an appropriate interpretation of the statute in cases in which there is an existing parental relationship, adhering to settled purpose or conscious disregard concepts in these cases in which no such relationship exists defeats the essential goal: prompt finality that protects the child's interests. Lehr, 463 U.S. at 266, 103 S.Ct. at 2996. As a matter of sound jurisprudence, this goal is paramount. Otherwise a young child languishes in limbo  surrendered by the mother, unclaimed by the father, and bonding with others  from which the law cannot extricate the child without lengthy proceedings compounding the harm.
Therefore, when determining whether an unwed father who has never had a relationship with his child has protected his rights, we judge abandonment by conduct, not by subjective intent. We believe the statute allows such an application as a matter of constitutional principle and text. The termination statute permits us to consider the needs of the child. § 8-533(B).[15] Implicit in this is the requirement that the father act, and act quickly, for those needs include a reasonably prompt determination of where and by whom the child is to be raised and nurtured. The law favors rapid placement so that the child can bond with those who will be the legal parents and not with those from whom the child may be taken. This sound policy benefits the child, the natural parents, the prospective adoptive parents, and society.
D. Did the trial court's factual findings support termination of parental rights?
In its Second Order, the trial court found clear and convincing evidence of abandonment, stating:
Instead of acting, [the father] gave up the fight, but said he never intended to give up the child.
* * * * * *
He abandoned his child by failing to attempt to establish a normal parental relationship with her without just cause for a period of six months. He did not provide support to her, nor did he attempt to establish contact with her and that appeared to be what he intended to do for an indefinite period of time.
Second Order at 6.
The father contends that the trial judge abused her discretion in making this finding.
*98 1. Did the father establish a parental relationship?
The mother testified that after she moved to Tucson she frequently called the father, but he rarely called her, though he knew how to reach her. On several occasions she asked him to send money, and although he said he would, he never did. After the father learned the baby was placed for adoption, he never asked about her or to see her. He did not try to communicate with the child until her first birthday, when he sent a gift through the adoptive parents' attorney.
The father justifies this conduct by saying he assumed the mother's and adoptive parents' attorneys were adversaries and would not help him because they were interested in facilitating the adoption. However, because the father never tried, we cannot say what the attorneys would have done or whether a substantial relationship might have developed. Nevertheless, had he tried, it is possible that a relationship would have been created.
In its first review of this case, the trial court focused on the father's actions before the child's birth. The court found that the father acted like a young man responsibly facing fatherhood: he bought baby furniture, began saving money, and purchased wedding rings in anticipation of marriage. Although these actions are responsible, they do not answer the question at hand because they responded to a different set of circumstances  the mother's expected return with the baby. They do not address the father's conduct once the facts changed. Nor do they satisfy the most important requirement: that the father act to create a bond with his child. The father's actions after the child's birth support the trial judge's finding that, even though the father learned of the impending adoption, he failed to make a meaningful effort to develop a relationship with his child.
Even if this finding was incorrect  and we do not intimate that it was  the result is the same. The ultimate question must be whether the father has, in fact, created a relationship. Even if this father had taken all possible steps to bond with his child and failed, Lehr's message is that to protect his interest, and the child's well-being, he must do more. For in the child's eyes, a valiant but failed attempt to create a relationship means little. Severing long-established bonds with others is equally harmful to the child, regardless of whether the father first attempted to create a relationship. Therefore, if the father's parenting attempts are unsuccessful, he must rapidly turn to legal recourse so that the child may obtain a final placement as quickly as possible. In this area, as in few others, there must be prompt recourse to the law.
2. Did the father promptly assert his legal rights?
The father also argues that although he could not form a relationship, he did assert his legal rights at the first opportunity by responding to the petition to sever. As previously noted, we place the burden of action on the parent. Ante at 96-98, 876 P.2d at 1131-1133. The father only asserted his interests in response to the petition to sever. If the adoptive parents had not acted, the evidence suggests that the father would have continued to do nothing. He had stopped calling attorneys after the first few months and made no attempt to obtain a hearing to block the adoption, seek custody, or establish paternity and assume the responsibility of support. He explained his behavior by saying he "wanted to take it slow." Reporter's Transcript of Severance Hearing at 59 (Dec. 1, 1992) (hereinafter "R.T."). He apparently believed he could sit back and wait because "they're going to come to me." Reporter's Transcript of Dependency Hearing at 86 (Sept. 27, 1993).
This Fabian tactic is rational, but it does not fulfill the requirement that an unwed father must "grasp [the] opportunity." Lehr, 463 U.S. at 262, 103 S.Ct. at 2993. The mother's attorney told the father that if he wanted to pursue custody, he must do so immediately because the child was bonding with her adoptive parents. R.T. at 67. We believe the trial court reasonably concluded that the father needed to do more than just wait to respond or oppose after the attorneys *99 came to him  he needed to affirmatively act to establish his rights.
We find, therefore, that the trial court did not abuse its discretion in concluding that the father abandoned the child because he failed to promptly and persistently grasp the opportunity to develop a relationship with his child or assert his legal rights.
3. Did the father have just cause?
The father argues that he had just cause for failing to assert his rights. The statute states that "[f]ailure to maintain a normal parental relationship with the child without just cause... shall constitute prima facie evidence of abandonment." § 8-546(A)(1) (emphasis added). The father claims he was prevented from developing a relationship with the child for two reasons: first because the mother gave her up, and then because attorneys manipulated the system against him, though they knew he did not want to lose his child. We agree he was hindered but disagree with his conclusion.
In Yuma County Juvenile Court Action No. J-87-119, a father faced with termination of his parental rights attempted to excuse his failure to develop a relationship with his child on the grounds that the mother had hidden the child. In finding abandonment, the court held:
[C]ommon sense suggests that a person in this father's shoes who really intended to maintain a relationship with his son would have done more than this father did to try to find his child

....
Even if every allowance is made for lack of sophistication and limited resources, the trial court was not compelled to believe that the father was actually stymied....
161 Ariz. 537, 540, 779 P.2d 1276, 1279 (Ct. App. 1989) (emphasis added).
As in the Yuma County Juvenile case, the father here contacted a few attorneys in Arizona and Texas to ask some questions. However, he did not ask any of them how he could protect his rights. Nor did he retain an attorney. He stayed in Texas, sent no support, and made no inquiries. In effect, he did nothing.
Had the father immediately and unequivocally stated to any of these attorneys that he was willing to take action to get his child back, we must assume that the attorneys would have at least directed him to pro bono counsel or to the courts. Had the father done so, and had the attorneys ignored his demands, this case might have a different cast. However, on this record, we agree with the trial court's conclusion that "[a]lthough the father had many legitimate reasons for not following up on suggestions by attorneys ... about how to fight for his child, none of those reasons rises to the statutorily required good cause." Second Order at 6.
4. Due process
The father claims that his procedural due process rights were violated by requiring him to assert his legal rights when he could not afford an attorney, one was not appointed to him until too late, and he did not have the knowledge, ability, or resources to proceed on his own. He claims such a procedure deprived him of meaningful notice and opportunity to be heard.
We agree that an unwed father has a right to develop a constitutionally protected relationship with his child. Therefore, we look closely at what process the constitution provides an unwed father:
[I]f the two elements of a constitutionally protected parent-child relationship are the biological link and commitment to and exercise of custodial responsibility, the state may not deny biological parents the opportunity to establish a protected custodial relationship.
Buchanan, Constitutional Rights, 45 OHIO ST.L.J. at 351 (footnotes omitted).
The state may not deprive a natural father of his parental rights without notice. Lehr, 463 U.S. at 263-64, 103 S.Ct. at 2994 (holding that New York's putative fathers' registry provides adequate notice); Appeal of H.R., 581 A.2d at 1165-66 (where state agency made no attempt to give notice of adoption to known father, father's due process rights were violated).
*100 However, in this case it was not the state that deprived the father but the child's mother, who gave the child up for adoption without the father's consent. In addition, a November 1, 1991 letter from the mother's attorney gave the father prompt notice of the pending adoption. He later learned that he had to take immediate action to safeguard his parental rights. R.T. at 38. When the father responded to the motion to terminate his parental rights, counsel was appointed for him. The father now argues that the attorney's appointment came too late for any meaningful opportunity to be heard, as due process requires. See Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (due process is related to time, place, and circumstances); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). We disagree.
The facts establish that the father's own inaction kept him from the courtroom. Considering the many lawyers supposedly consulted, the father or his parents could have asked what to do, what court to contact, or where to get pro bono services. Instead, the father's own testimony indicates that he did not want to go to court but just wanted to go slowly. Even if no attorney would provide services, the father, with the help of his parents, could have tried to protect his rights pro se. Many civil litigants cannot afford counsel but still gain access to the judicial system. Even given this father's difficulties accessing the judicial system, we require something more than telephone calls to un-named attorneys.
Even if it were possible to excuse the father's failure to protect his rights, his argument still fails. In response to the petition to terminate parental rights, the court appointed counsel for the father on June 4, 1992. On January 5, 1993, the court had to order him to establish formal paternity, a necessary prerequisite to custody. Even then, the father did not begin the process until seven months after the court ordered him to act. In short, the father did not begin to assert his legal rights in a meaningful way that would have furthered his relationship with his daughter until twenty months after her birth and several months after obtaining counsel. The father was not denied his due process rights; he consciously failed to assert his legal rights in a timely manner.
5. Is termination of the father's parental rights in the best interests of the child?

Even though we have concluded that the father abandoned his child, we must still determine whether termination of his parental rights is in the child's best interest.[16]Maricopa County Juvenile No. JS-500274, 167 Ariz. at 5, 804 P.2d at 734 ("best interests of the child are a necessary ... condition for an order of termination").
Social services personnel report that the child is thriving in her adoptive home. She has been with the adoptive parents since shortly after birth and is deeply attached to them. Although not dispositive, studies show that removing a child from familiar surroundings at this age may cause substantial harm. These factors support the trial judge's conclusion that the child's interests would be better served by leaving her in her current home.
CONCLUSION
We conclude that the trial judge did not exceed her jurisdiction, abuse her discretion, or err in the procedure adopted at the second hearing. The evidence supports the judge's findings that the father abandoned the child, as that term is legally defined, and that grounds for termination of parental rights *101 existed. We therefore affirm the Second Order terminating the father's parental rights.
In doing so, we acknowledge that the result for the father is harsh. We deal with a poor and educationally disadvantaged young man who, as the trial judge found in her First Order, wanted to assume his parental responsibilities. From his point of view, it may be fair to accord him parental rights and remove the child from the only family she has known, even if this threatens her well-being.
Even if this gave a just result to the father, it would needlessly endanger the child. The law recognizes that judges cannot craft perfect justice for all sides in these disputes. Judges must simultaneously protect the parent's interests and safeguard the child's stability and security. Hence, we have adopted a rule that preserves parental interests when the parent grasps the opportunity quickly, diligently, and persistently. When the parent fails to do so, even though the failure may be understandable, the trial court may find abandonment and terminate parental rights if that is in the child's best interest.
We therefore vacate the court of appeals' opinion and affirm the trial court's termination order.
MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.
MARTONE, Justice, concurring in the judgment.
The federal constitutional rights of unwed fathers were never at issue in this case. Instead, this case was always about the appropriate standard applicable to the question of abandonment sufficient to terminate parental rights under A.R.S. § 8-533(B). The parties did not raise the question of the constitutional rights of unwed fathers because that issue did not matter to them. This termination was sought only as a predicate to an adoption proceeding. And under A.R.S. § 8-106, with certain exceptions, no adoption can be granted without the consent of "both birth parents," unless those parental rights have been judicially terminated. Thus it did not matter that the father's rights here might have been less than those the federal Constitution guarantees to wedded fathers because a specific state statute accords him greater rights. There is, of course, nothing in the federal Constitution which prevents a state from doing that.
Nor, under these facts, does the father's unwed status matter. There has been statutory abandonment, married or not. For these reasons, this case was tried on an abandonment theory without reference at all to the federal constitutional rights of unwed fathers. The petition for review raises no issue with respect to the rights of unwed fathers.[1] We granted review to decide whether the "settled purpose" or the "conscious disregard" test should be used in determining if a parent has abandoned a child. After oral argument, we decided "that the *102 trial court and the court of appeals erred in not adopting and applying the definition of `abandoned' contained in A.R.S. § 8-546(A)(1)." Order of February 4, 1994 at 1. We adopted the statutory standard and remanded the case to the trial court to hold an evidentiary hearing on "the issue of abandonment under A.R.S. § 8-546." Order at 3. Nowhere in our remand order do we ask the trial court to consider the relationship between the federal constitutional rights of unwed fathers and our abandonment statute.
Following our instructions, the trial court held a new hearing and found that, applying the correct statutory standard, there was abandonment here. Thus our task now is to simply examine whether the trial court's finding is supported by the evidence. This case affords us no opportunity to address the quite separate question of an unwed father's federal constitutional rights because, even if the parties had been married, there was abandonment here under § 8-546. The court believes it must reach the federal constitutional question because of problems posed by the "settled purpose" test. But the "settled purpose" test is not part of the statute. "Intent" as used in § 8-546 is to be determined by an objective, not a subjective, standard.
I believe we have an obligation to avoid the resolution of constitutional questions unless we must. We should decide issues only when expressly raised by the parties, briefed, and argued in this court. Our opinions are likely to be more reliable when the issues we decide are those the parties bring to us rather than those we raise ourselves.
I concur in the judgment here because, having applied the correct statutory standard under § 8-546(A)(1), the evidence supports the trial judge's finding of abandonment.
NOTES
[1] Although at this point the parties' names have frequently appeared in the press, we decline to use their names in this opinion.
[2] We refer to the laws governing termination and adoption as they existed when this action came before us. However, since then, the Arizona Legislature has drastically amended these laws, presumably in response to this and similar cases. We apply the law's earlier version but note these new changes. For example, the new legislation does not require the unwed father's consent to adopt unless he judicially establishes paternity and registers with an as yet nonexistent putative father's registry. A.R.S. §§ 8-106(A)(2) and 8-106.01(G) (eff. July 17, 1994).
[3] The attorney did not allege he was acting on behalf of the adoptive parents, but that obviously was his purpose. The statute permits "any person ... that has a legitimate interest in the welfare of a child" to file a severance petition. A.R.S. § 8-533(A). No objection has ever been made to the attorney's initiation of this action. Thus, any objection to standing is precluded. See State v. B Bar Enter. Inc., 133 Ariz. 99, 101, 649 P.2d 978, 980 (1982) (for jurisdictional purposes, standing is not a constitutional requirement in Arizona courts; if not raised, a court may consider the merits); Ariz.R.Civ.P. 12(i). Further, the guardian ad litem for the child is undoubtedly an interested party with a legitimate interest in the child's welfare and has participated in every phase of this action, both trial and appellate.
[4] See post at 95-96, 876 P.2d at 1130-1131.
[5] We recognize the unusual nature of the order suspending the appeal, the remand to the trial court, and the subsequent procedure. Under the circumstances, however, every day of delay increases uncertainty, harms the child, and further heightens the anxiety of all the adults involved  mother, father, adoptive parents, concerned family members, and friends. Employing this uncommon procedure was the only way to be true to our appellate role by having the trial court remain the fact finder while at the same time providing for a swift and constitutionally sufficient appeal.
[6] In Arizona, relief formerly obtained by writs of prohibition, mandamus, or certiorari is now obtained by special action. Ariz.R.P.Spec.Act. 1. The adoptive parents' attorney did not appeal the First Order, although the child did. Therefore, the adoptive parents' attorney is not a party to these proceedings. However, because he was a party at the trial level, the trial judge apparently allowed him to participate in the second hearing. We consider his comments to the trial court's new findings because he is a party to the special action proceedings.
[7] The trial court, in the First Order, found the child dependent on the state pursuant to A.R.S. § 8-538(D), presumably because none of the parties was entitled to legal custody. The adoptive parents had no legal ties to the child, the mother had relinquished her parental rights, and the father had not established paternity, a statutory requirement for unwed fathers under the custody statute. See A.R.S. 25-331(C). Therefore, the court granted legal custody to Child Protective Services of the Department of Economic Security and physical custody to the adoptive parents pending the outcome of the subsequent dependency hearing. See §§ 8-241 and 8-403.

Having refused to sever the father's parental rights, the trial court ordered a dependency hearing to determine whether the father was capable of taking physical custody of the child and to develop a case plan to gradually transfer the child from the adoptive parents to the father. At that hearing, extensive testimony was taken regarding the father's fitness.
[8] The court of appeals rejected the minor's contention that the Lehr analysis requires a different outcome because of the court's interpretation of A.R.S. § 8-601, which states: "Every child is the legitimate child of its natural parents...." The court held that this statute prevented the state from treating unwed fathers differently than wed fathers. We disagree. Section 8-601 merely prevents the state from treating the children of unwed parents differently than the children of married parents. It has no bearing on parental rights.
[9] The concurring opinion expresses concern that the "federal constitutional rights of unwed fathers were never at issue in this case." Post at 101, 876 P.2d at 1136. Our view is to the contrary. Whenever the state acts to terminate a parental relationship, federal constitutional rights are necessarily at issue because parents' rights to the care, custody and control of their children are fundamental. See Santosky, 455 U.S. at 753, 102 S.Ct. at 1394; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Thus, because the ultimate issue before us is the proper standard for abandonment, I believe it is unwise to address this issue without considering the constraints of the federal constitution.

The litigants evidently share this view. The father was the successful party in the initial proceedings, but when, on remand, the father's rights were terminated by the Second Order, he filed a timely pleading raising his federal constitutional rights. Objections at 13 (the "right to the control and custody of one's children is a fundamental one," citing Stanley, 405 U.S. 645, 92 S.Ct. 1208); see also Petition for Special Action at 6. Moreover, the minor argues that Lehr, Quilloin, and Caban require a "balancing of the rights" of parent and child "particularly where there is no developed parent-child relationship." Petition for Review at 16-17, n. 9.
The court of appeals evidently recognized the minor's constitutional claim as well:
The child claims this is unfair, particularly in light of decisions of the United States Supreme Court discussing the minimal rights of the biological parent of an illegitimate child [citing Lehr and Quilloin].
* * * * * *
We are unpersuaded by these arguments. Parents have a fundamental liberty interest in the care, custody, and management of their children [citing Santosky].
Pima County Juvenile No. JS-114487, 144 Adv. Rep. at 49, 1993 WL 276801.
As is apparent, we are persuaded by these arguments. We do not agree with the concurring opinion that the father's unwed status does not matter. Post at 101, 876 P.2d at 1136. Had the parents been married we would be presented with much different issues. A married father is vested with a legal right to custody. See, e.g., Quilloin, 434 U.S. at 256, 98 S.Ct. at 555 ("legal custody of children is, of course, a central aspect of the marital relationship"); Campbell v. Campbell, 126 Ariz. 558, 559-60, 617 P.2d 66, 67-68 (Ct.App. 1980). A married mother would arguably be guilty of custodial interference under the facts of this case, as would the attorneys and adoptive parents if they acted knowingly. A.R.S. § 13-1302(A).
We do not decide these issues as they are not before us. Nor do we see the relevance in the alleged greater rights provided in the adoption statute. Post at 101, 876 P.2d at 1136. The only issues before us pertain to termination of the rights of an unwed father yet to establish a parental relationship and hindered from doing so by the mother's actions.
[10] A.R.S. § 8-533 provides, in pertinent part:

B. Evidence sufficient to justify the termination of the parent-child relationship shall include any one of the following, and in considering any of the following grounds, the court may also consider the needs of the child: 1. That the parent has abandoned the child.
[11] Until 1982, the termination statute contained its own definition of abandonment. When that was deleted, our courts seemingly set off on their own, generally ignoring the definition in § 8-546, until In re Appeal in Maricopa County Juvenile Action No. JS-500274, 167 Ariz. 1, 804 P.2d 730 (1990), which quoted the settled purpose doctrine and the § 8-546 statutory test in a termination proceeding.
[12] Arizona courts have used these tests interchangeably, frequently invoking settled purpose while simultaneously relying on conscious disregard to resolve the case. See In re Appeal in Maricopa County Juvenile Action No. JS-6520, 157 Ariz. 238, 242, 756 P.2d 335, 339 (1988); In re Appeal in Pima County Juvenile Action No. S-139, 27 Ariz. App. 424, 427, 555 P.2d 892, 895 (1976); Anonymous v. Anonymous, 25 Ariz. App. 10, 12, 540 P.2d 741, 743 (1975).
[13] This is not the first time an Arizona court has relied on Lehr to illuminate the meaning of a statute addressing the rights of unwed fathers. In State v. Bean, the state faced an equal protection challenge to the custodial interference statute, A.R.S. § 13-1302, which grants to the mother sole legal custody of a child born out of wedlock, until paternity is established and custody is determined. 174 Ariz. 544, 851 P.2d 843 (Ct.App. 1992). Citing Lehr and Quilloin, Bean holds that "not all natural fathers are similarly situated.... [S]tates are not foreclosed from recognizing differences in the extent of commitment made by fathers to the welfare of their children." Id. at 547, 851 P.2d at 846.
[14] We note that the new legislation deletes the intent language from the abandonment definition. Thus, the importance we place on the father's conduct accords with the new law's terms. See A.R.S. § 8-531(1) (eff. July 17, 1994).
[15] The father argues that the trial court erred in its interpretation and application of the portion of the termination statute that permits the court to take into account whether the needs of the child were being met. § 8-533(B). The father argues that the child's needs were being met by the adoptive parents; thus, she was not abandoned, and his failure to provide support did not harm her. We read the statute differently. We believe the statute directs the court to consider whether the parent whose rights are at issue has met the needs of the child.
[16] The child's guardian ad litem and her amici curiae contend that we should determine this case based on the best interests of the child, even absent a finding of abandonment. We disagree. We have held that parent and child share the same interest in maintaining their family until the parental relationship is terminated. See Maricopa County Juvenile No. JS-500274, 167 Ariz. at 5, 804 P.2d at 734 (citing Santosky, 455 U.S. at 760, 102 S.Ct. at 1398) ("`[C]hild and ... parents share a vital interest in preventing erroneous termination of their natural relationship.'"). The child's interests are adequately protected and fairly balanced with the parents' interests by the test we apply today. Finally, we believe that focusing our inquiry on the child leads us down a dangerous path  namely, who can provide a better family. But see A.R.S. § 8-533(B) (eff. July 17, 1994) ("the court shall also consider the best interests of the child" in finding abandonment).
[1] We granted review on the following issues:

1. Did the Court of Appeals err in concluding that the definition of abandonment set forth in A.R.S. § 8-546(A)(1) is not applicable to a severance proceeding pursuant to A.R.S. § 8-533?
2. Did the Court of Appeals err in concluding that the "settled purpose," rather than "conscious disregard," standard is the appropriate standard for determining whether there has been abandonment sufficient to justify severing parental rights pursuant to A.R.S. § 8-533(B)(1)?
3. Did the Court of Appeals err in affirming the Juvenile Court's findings of fact?
4. Did the Court of Appeals err in affirming the Juvenile Court's conclusion that there was no abandonment?
5. Did the Court of Appeals err in concluding that a child has no due process or equal protection right to have her interests considered in the course of determining whether she had been abandoned within the meaning of A.R.S. § 8-546(A)(1)?
Petition for Review at 3. We also asked for briefs on two additional issues: whether the superior court had jurisdiction to consider and rule on a petition for severance of parental rights in the absence of a prior adjudication or acknowledgement of paternity; and whether In re Appeal In Maricopa County Juvenile Action No. JS-500274, 167 Ariz. 1, 804 P.2d 730 (1990), has any relevance or effect upon this case.
The court says the father raised his federal constitutional rights. Ante at 94, n. 9, 876 P.2d at 1129, n. 9. But he would have no occasion to ever suggest he had fewer rights because he was not married.