NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TONY J., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.J., *Appellees*.

No. 1 CA-JV 16-0531
FILED 4-27-2017

Appeal from the Superior Court in Maricopa County
No. JD31782
The Honorable Sally S. Duncan, Judge

**AFFIRMED**

COUNSEL

Law Office of Robert D. Rosanelli, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Daniel R. Huff
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

**W I N T H R O P**, Judge:

**¶1**        Tony J. ("Father"), the biological father of A.J. ("the child"), appeals the juvenile court's order terminating his parental rights to the child on the grounds of abandonment and length-of-sentence.[1]  Father challenges the statutory bases for severance found by the court.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

**¶2**        The child was born in January 2014.  In June 2015, Father was arrested and booked into custody for armed robbery, a class two felony, and theft, a class three felony.  He was convicted as charged and ordered to serve concurrent sentences of 3 and 3.5 years' imprisonment in the Arizona Department of Corrections ("ADOC").[3]  On December 28, 2015, Father was transferred to the ADOC complex in Yuma.

**¶3**        Meanwhile, on December 7, 2015, the Department of Child Safety ("DCS") received a report that Mother had been arrested on drug and child abuse charges after law enforcement officers found heroin and drug paraphernalia in a hotel room where Mother, the child, and Mother's "significant other" were residing.  The officers also found a "meth pipe" and heroin in Mother's bag, and Mother admitted she had been abusing heroin for at least six months.  Mother later acknowledged she had been a drug addict for five years.

**¶4**        DCS removed the child from Mother's care.[4]  At the time of the child's removal, Mother reported that Father was incarcerated,

---

[1]        The child's biological mother ("Mother") died shortly before the contested severance hearing and is not a party to this appeal.

[2]        We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

[3]        Father's scheduled release date is June 9, 2018, and his maximum end date is March 8, 2019.

[4]        DCS also noted that the child's diaper was soaked and his juice bottle was expired, and after the child's removal, DCS learned the child's teeth were rotting.  Mother acknowledged having been advised by a dentist in

although DCS could not immediately determine where, or when he might be released. The child was placed in a licensed foster home, and DCS eventually concluded that Father had abandoned the child because Father had "not seen the child for an extended period of time," had "not sent cards, gifts, letters, or support to the child during that time," and had "failed to seek custody or parenting time with the child."

¶5        On December 10, 2015, DCS filed a dependency petition, alleging the child was dependent as to Mother based upon her drug use and as to Father based upon abandonment and his incarceration.

¶6        By early January 2016, DCS had located Father at the ADOC complex in Yuma. DCS obtained an order requiring Father to submit to DNA testing to establish his paternity of the child,[5] and Father was served with the dependency petition.

¶7        In March 2016, the court found the child dependent as to Mother. Meanwhile, DCS had been offering Mother numerous services and encouraged Father to participate in any services available to him while incarcerated.

¶8        Mother was generally noncompliant with services, and in April 2016, she was briefly incarcerated. Father appeared telephonically at the April 29, 2016 initial hearing on the dependency petition, and the juvenile court adjudicated the child dependent as to Father and approved a case plan of family reunification concurrent with severance and adoption.[6]

¶9        Over the next several months, nothing changed; Mother continued to be noncompliant with services, and Father remained incarcerated and had not engaged in services at the prison. At a July 25,

---

Sacramento that the child needed dental care, but she had failed to follow up on the required care and admitted the child "eats nothing but candy." DCS also learned that, despite Mother's awareness that DCS had previously removed her significant other's children from his care due to his drug use, Mother had continued to expose the child to him.

[5]        The lab conducting the DNA testing subsequently disclosed that the probability of Father's paternity was 99.99 percent.

[6]        Mother had been released by this time and appeared at the hearing.

2016 report and review hearing, Father appeared telephonically, and the juvenile court granted DCS's motion to change the case plan to severance and adoption.

¶10      On August 26, 2016, DCS moved to terminate the parents' parental rights to the child. As to Father, DCS moved to terminate his rights on the statutory grounds of abandonment, his conviction of a felony the nature of which proved his unfitness to have future custody, and the length of his prison sentence.[7] *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(1), (4) (Supp. 2016).

¶11      Mother passed away shortly before the November 28, 2016 hearing on the motion for termination, and at the hearing, the DCS case manager assigned to the case testified that Father had not had or attempted to have any contact with the child since the child's removal from Mother's care in December 2015. The case manager testified she provided Father with her mailing address after receiving a collect phone call from him early in the case, twice mailed "service letters" to Father during the dependency (in May and October 2016), and had received no mail returned as undeliverable. Nonetheless, during the nearly year-long interval that the child had been in DCS's care, Father had not contacted DCS to inquire about the child's well-being or to request visitation, and had not provided the child with any correspondence, gifts, or financial support. The case manager further testified that, given Father's incarceration, his relationship with the child could not be nurtured because "[i]t's very hard for a parent to [care for a] child while in incarceration. He's not there on a day-to-day basis. He's not there to help . . . when things go on." She added that, although generally allowed, personal visits with prisoners such as Father were "very limited," and phone calls were also limited based on an inmate's behavior while in prison. Moreover, because Mother had died, the child had no other parent to care for him.

¶12      Father testified that before he was arrested in June 2015, he had lived with Mother and the child, and would take the child "to go fishing," "to go feed the ducks," and "to go to Chuck E Cheese all the time." Father also testified that he and the child were "very close," and he denied ever noticing Mother's substance-abuse issues. After he was incarcerated, Father became aware of DCS's involvement "around before Christmas in 2015," and thereafter, he submitted to the paternity test that established his paternity to the child. Father claimed he was unable to send correspondence to the child from prison because he did not know the

---

[7]      DCS later withdrew the nature-of-felony ground.

address, had not received any letters from DCS, and was not permitted to make calls from prison, but he also acknowledged he had been telephonically present for court hearings and had never raised the issue. Father also claimed he had begun taking parenting classes and had "just start[ed] sending [the child] letters."

**¶13** At the close of the hearing, the juvenile court granted DCS's motion to terminate Father's parental rights to the child on the grounds of abandonment and length-of-sentence. In part, the court found that Father had "failed to provide reasonable support, maintain regular contact and/or normal supervision" of the child since his incarceration in June 2015 and that, given Father's expected release date, "the child would be deprived of a normal home for a period of years." Finally, the court found that severance was in the child's best interest.

**¶14** Father filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

### I. Standard of Review

**¶15** A parent possesses a fundamental liberty interest in the care, custody, and management of his child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000)). Even fundamental rights are not absolute, however. *Id.* (citing *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

**¶16** The juvenile court retains great discretion in weighing and balancing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982). As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4, 100 P.3d 943, 945 (App. 2004)). Thus, the resolution of conflicts in the evidence is uniquely the province of the

juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002); *see also Pima Cty. Adoption of B-6355*, 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978) ("In considering the evidence it is well settled that an appellate court will not substitute its own opinion for that of the trial court." (citation omitted)).

¶17 We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004). In reviewing the juvenile court's decision to terminate parental rights, we review *de novo* questions of law and the court's legal determinations, including the application of a statute or rule. *See Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 210, ¶ 18, 181 P.3d 1126, 1131 (App. 2008); *Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998); *Maricopa Cty. Juv. Action No. JV-507879*, 181 Ariz. 246, 247, 889 P.2d 39, 40 (App. 1995).

*II.      Father's Argument Regarding Abandonment*

¶18 Father argues the juvenile court erred in terminating his parental rights on the ground of abandonment, claiming that DCS and the court "interfered" with his ability to maintain a relationship with the child. Specifically, Father claims he "was completely uni[n]formed that he could have visits or communicate with the child" and "believed that he could not address the court" during hearings regarding visitation.

¶19 Under A.R.S. § 8-533(B)(1), the juvenile court may terminate parental rights if "the parent has abandoned the child." Abandonment is defined as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision," and "includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child." A.R.S. § 8-531(1) (Supp. 2016). "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.* Under A.R.S. § 8-531(1), "abandonment is measured not by a parent's subjective intent, but by the parent's conduct: the statute asks whether a parent has provided reasonable support, maintained regular contact, made more than minimal efforts to support and communicate with the child, and maintained a normal parental relationship." *Michael J.*, 196 Ariz. at 249-50, ¶ 18, 995 P.2d at 685-86.

¶20 A parent's incarceration, standing alone, does not provide a legal defense to a claim of abandonment or justify severance on the grounds of abandonment. *Id.* at 250, ¶ 22, 995 P.2d at 686. Instead, incarceration is merely one factor that the juvenile court may consider in evaluating whether a parent can perform parental obligations. *Id.* When circumstances such as incarceration prevent a parent from exercising traditional methods of bonding, the parent "must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Id.* (quoting *Pima Cty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97, 876 P.2d 1121, 1132 (1994)). "The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *Id.* at 251, ¶ 25, 995 P.2d at 687 (citing *S–114487*, 179 Ariz. at 98, 876 P.2d at 1133). Thus, "the father must take concrete steps to establish the legal or emotional bonds linking parent and child," and "do more than just wait to respond [to legal proceedings] or oppose" a severance motion, "he need[s] to affirmatively *act* to establish his rights." *S-114487*, 179 Ariz. at 96, 98-99, 876 P.2d at 1131, 1133-34.

¶21 Even assuming *arguendo* that Father's claims are true, Father bore the burden of ensuring that he maintained a parent-child relationship with the child, and reasonable evidence supports the juvenile court's findings that he did not. The record indicates that Father had effectively abandoned the child even before DCS and the court became involved because, when DCS removed the child from Mother's care in December 2015, DCS learned that Father had neither seen the child nor made efforts to contact him or send support or gifts to him "for an extended period of time." DCS located Father by the next month, had him served with the dependency petition, and arranged for him to submit to DNA testing and establish his paternity of the child—something Father had not done since the child's birth approximately two years earlier. Despite being provided the case manager's contact information and appointed counsel (with contact information), Father failed for nearly a year to have any contact with the child, attempt to seek visitation or otherwise communicate with the child, ask about the child's well-being, or send the child any correspondence, gifts, or financial support.[8] Although Father claims he did not know he could address the court regarding visitation during the hearings he attended, such a claim, even if true, does not explain why he did not ask either the case manager or his counsel about visitation. Father could have sent letters or requested visits through either of them while the child was in DCS's care.

---

[8] The record indicates Father has been employed while in prison.

**¶22** Accordingly, reasonable evidence shows that Father made no effort to communicate with, support, or maintain any parent-child relationship with the child for over six months without just cause. The court's severance order based on abandonment is supported by clear and convincing evidence.[9]

### III. Best Interest

**¶23** Father does not challenge the juvenile court's finding that severance was in the child's best interest; however, we note that the record supports the finding.

**¶24** At the time of the severance hearing, the child had remained with the same prospective adoptive family throughout the dependency, and had bonded with his foster parents, who he viewed as his mother and father.[10] *See Oscar O.*, 209 Ariz. at 334, ¶ 6, 100 P.3d at 945; *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998). The record also indicates the child's foster placement is meeting the child's physical, social, educational, medical, psychological, and emotional needs. *See Audra T.*, 194 Ariz. at 377, ¶ 5, 982 P.2d at 1291. Further, the court found and the record demonstrates the affirmative benefits of permanency and stability available to the child from severance. *See generally Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6-7, 804 P.2d 730, 735-36 (1990).

---

[9] Father also argues the juvenile court erred in terminating his parental rights based on the length-of-sentence ground. Because clear and convincing evidence supports the statutory ground of abandonment, we need not address Father's claims pertaining to the length-of-sentence ground. *See Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205 (citations omitted); *see also* A.R.S. § 8-533(B) (requiring that evidence sufficient to justify the termination of the parent-child relationship include "any one" of the enumerated termination grounds).

[10] Although DCS had contacted the paternal grandmother, who had stated that she would talk with Father's family to see if anyone could participate in an out-of-state assessment for potential placement of the child, neither the paternal grandmother nor any other paternal relative had provided DCS with additional information.

**CONCLUSION**

**¶25**  The juvenile court's order terminating Father's parental rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA