NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

JARED M., AMBER M., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.M., M.M., *Appellees*.

No. 1 CA-JV 15-0085
FILED 11-19-2015

---

Appeal from the Superior Court in Maricopa County
No. JS17188
The Honorable Connie Contes, Judge

**AFFIRMED**

---

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Mother*

Heavenly Gates Law Firm, Phoenix
By S. Marie Gates
*Counsel for Appellant Father*

Arizona Attorney General's Office, Phoenix
By Amanda Adams
*Counsel for Appellee*

_____

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

_____

**H O W E**, Judge:

**¶1**          Amber M. ("Mother") and Jared M. ("Father") appeal the juvenile court's order terminating their parental rights to A.M., born May 2011, and M.M., born April 2012, on ground of neglect and willful abuse. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**          In February 2012, when Mother and Father already had three foster children in their care, including A.M. and M.M., the Department[1] placed two-year-old J.C. with them. The parents subsequently adopted A.M. and M.M. During the seven months J.C. was in Mother and Father's exclusive care, the child suffered two injuries. As a result, the Department petitioned for dependency and then termination of Mother and Father's parental rights to A.M. and M.M. on ground of neglect and willful abuse.

**¶3**          In January 2013, J.C. dislocated his right hip. Father took J.C. to urgent care, but he was sent in an ambulance to a children's hospital for treatment. Father reported to the hospital staff that he was lifting J.C. over the rails of the child's bed and accidentally dropped him. Father thought that the child might have hit a part of the bed during his fall. J.C. fell about 2.5 to 3 feet and landed on his right side. Father said that J.C. behaved "normally" afterwards, however, and not until the next morning did the child complain of pain in his right leg and became incapable of carrying anything with his right arm.

**¶4**          Although J.C.'s hospital discharge papers stated that the incident was an "accidental trauma," one of the consulting doctors—a forensic child abuse expert—noted in her report that such an injury was

_____

[1]      The Department of Child Safety was substituted for the Arizona Department of Economic Security in this matter. *See* Ariz. R. Civ. App. P. 27; S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted). For convenience, we refer to both as "the Department."

uncommon for a child under five and found Father's explanation that J.C. could walk afterwards "curious." She opined that the injury could have been an accident or was inflicted. The doctor also noted scratch marks on the child's neck and chin and a bite mark on his cheek. Father explained that J.C. often scratched himself when he was upset and a foster sibling had bitten him. The Department was notified of J.C.'s injury, but did not remove him.

¶5        Several months later from June 24 to 27, J.C. was at vacation bible school. J.C.'s camp counselor said that during bible school, he was "very active" and "use[d] both his arms" and "was happy as a clam but spastic." No reports were submitted that J.C. was injured.

¶6        After J.C. returned to Mother and Father's house, the family left for South Dakota on June 28. When they stopped for lunch, Father noticed that "when [J.C.] got down out of the van, he would like push himself along the floor and he just wasn't putting all of his weight on his left arm." They nonetheless continued driving to Colorado. There, J.C. struggled to take his shirt off and complained of pain, but the family resumed their journey. When they stopped at a rest area, Father observed that J.C. "was not playing as he normally should. . . . He was standing against the wall." Despite Father's observation, the family continued to South Dakota. There, J.C. was in more pain; he had "less movement and more whines." Although "everybody" in the family noticed J.C.'s injury, Mother and Father "did not believe it was the extent that it—that he was making it to be."

¶7        On June 30, Mother noticed that J.C.'s arm was swollen and that J.C. did not use his arm. Four days later, she took J.C. to the emergency room. She explained to the hospital staff that J.C. "was swimming yesterday and seemed to be using the arm normally," but after waking up that morning, his arm "was quite swollen" and he could not move it. The treating physician told Mother that the x-rays were normal and recommended that J.C. wear a sling. J.C. stopped wearing the sling three days later, however, because the swelling "was getting worse." The family returned to Arizona on July 8, J.C. saw his pediatrician the next day, and he had a MRI on July 12, revealing a left fractured humerus.

¶8        On July 15, J.C. returned to the same children's hospital where he had received treatment for his dislocated hip. J.C. was admitted and received additional imaging and a full skeletal survey, which showed a one to three months' old right scapular fracture that was healing. J.C. was

reported to the hospital's child protection team for suspected non-accidental trauma.

¶9          The same child abuse expert who had been consulted about J.C.'s prior hip dislocation examined his swollen arm. She opined that the left fracture of the humerus was two to four weeks old and that the fracture would have "require[d] [a] significant force . . . and would [have] cause[d] considerable pain at the time . . . and for a week or more after." She also opined that it was "very unlikely that the fracture happened accidently . . . [or] was unrecognized at the time because of the pain." She further opined that the previous x-rays were probably misread because J.C.'s fracture was through the growth plate and missing such a fracture was common. She noted that "inflicted injury continue[d] to be the . . . primary concern" and recommended that J.C. participate in a forensic interview and that the Department protect him and his foster siblings while it and the police investigated the situation.

¶10          That evening Mother and Father participated in forensic interviews. Father reported that they were not sure what happened to J.C.'s shoulder. During the trip, J.C. was not using his left arm or putting any weight on it and was "kind of . . . whimpering." Only when they noticed that his arm was swelling did they take him to the emergency room. Father also reported that he, J.C., and A.M. had fallen into a pool while in South Dakota. The incident occurred on July 2, "after [they] had already had [their] initial appointment . . . at the Emergency Room." Father was holding the boys' hands, lost his balance, and slipped into the pool, and J.C. fell into the water.

¶11          Mother reported that they had first noticed that J.C. was not using his left arm on June 30, after they had arrived in South Dakota. Mother reported that the family had gone swimming that day and Father, J.C., and A.M. fell into the pool. They took him to the emergency room because his arm was swollen. Mother reported that J.C. did not complain about his arm during the drive to South Dakota.

¶12          Based on these interviews and the circumstances, the Department took custody of J.C., A.M., and M.M. after J.C. was discharged from the hospital on July 17 and placed each of them in separate foster homes. The Department petitioned for dependency alleging that A.M. and M.M. were dependent as to Mother and Father. It alleged that the parents had either abused J.C. or had failed to protect him from abuse and that A.M. and M.M. were at risk of future abuse as a result of the parents' action or inaction, respectively.

¶13        While J.C. was in foster care, Mother and Father sent the child some toys. When he saw one of them, J.C. threw it in the trash. The child's foster mother told him not to throw his toy away, and he became frightened, grabbed his left arm, and told her "please don't hurt my arm."

¶14        J.C. participated in a forensic interview and reported that he got an "owie" from the "T.V." and that "mommy did it at the hotel" and "it's swollen." J.C. also reported that "mom and dad were there," "mom hit him," and "daddy saw." When asked where Mother hit him, he rubbed his left arm with his right hand and responded "on my arm." When asked what Mother hit him with, he pointed to his hand and said "this one."

¶15        By that time, the Department had placed A.M. and M.M. together in a different foster home, this time with family friends at the parents' request. Soon after, the foster family reported that A.M. exhibited aggressive behavior, hoarding food, and having nightmares. They also explained that M.M. was constantly sucking his thumb, especially after returning from visits with his parents. They further reported that if A.M. heard the song, "Head, Shoulders, Knees, and Toes," he would hide behind the couch and scream. The daycare supervisor reported that both children were withdrawn.

¶16        The following month, the parents participated in psychological evaluations. Mother reported that she did not know what happened to J.C.'s arm and believed "it may have been accidental." The psychologist found that Mother was "fairly defensive" and was not able to admit to any shortcomings. He also found that Mother "may not have answered in a completely forthright manner." The psychologist recommended that Mother participate in individual counseling and child-management classes. The psychologist opined that a child in Mother's care would be at risk of physical harm and that her prognosis for being able to parent in the foreseeable future was "not good."

¶17        Father also reported that he did not know what happened to J.C.'s arm. He reported that he heard J.C. cry "a few times" while the family was packing for their trip and suggested that perhaps J.C. was "jumping and fell." The psychologist found that Father was defensive and recommended that he participate in counseling and child-management classes. The psychologist opined that Father "could be able to demonstrate adequate parenting skills if it [was] determined that he was not the cause of [J.C.'s] injuries."

¶18 Mother and Father then participated in masters– and Ph.D.–level individual counseling, supervised visits, parenting classes, and parent aide services, including one-on-one parenting instruction. Although they participated in the services, they refused to acknowledge that J.C. had suffered non-accidental trauma and denied any knowledge of or responsibility for J.C.'s injuries. A.M. and M.M. were both referred to play therapy and participated in psychological evaluations and were diagnosed with post-traumatic stress disorder and reactive attachment disorder. A.M. also received speech and physical therapy and M.M. occupational therapy.

¶19 Meanwhile, J.C. had a second forensic interview and continued to talk about his injuries. He reported that Father had hurt his right shoulder "in the bathroom" and that Mother had hurt his left shoulder "at the hotel room." He also reported that Mother bit and slapped him in the face. J.C.'s foster mother reported that he would "shake, cry and [wet himself] when he was disciplined," "experienced night terrors," and was fearful of "running into his old parents." In November 2013, J.C.'s foster parents adopted him.

¶20 The following month, A.M. was identified as an Indian child subject to the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901–63. On the eve of the dependency hearing, the Alaskan Native village where he was eligible for enrollment had not yet been served. Thus, instead of holding a dependency hearing for A.M., the juvenile court ordered an initial dependency hearing. For M.M., however, the court held a dependency hearing and adjudicated him dependent as to both parents. The court found that the parents had abused J.C. because of the "uncontroverted expert medical testimony" that J.C., who was in the parents' "care, custody, and control" "sustained two (2) fractures."

¶21 Because the Department had indicated that it would move for termination of parents' parental rights to A.M. and M.M., the juvenile court thereafter ordered concurrent case plans of family reunification and severance and adoption for M.M. The parents then moved for a finding that the Department had not made reasonable efforts to achieve the case plan goal of family reunification as ICWA required. At A.M.'s dependency hearing, the juvenile court deferred its reasonable efforts finding until the next hearing, but found that A.M. was dependent as to both parents.

¶22 In April 2014, because the parents were still unable to provide a sufficient explanation for J.C.'s injuries, the Department petitioned to terminate Mother and Father's parental rights to A.M. and M.M. on ground of neglect and willful abuse. The juvenile court thereafter ordered the

children's case plan as severance and adoption. The parents once again moved for a finding that the Department had not made reasonable efforts to achieve the case plan and that it had not made active efforts to prevent the family's breakup with regards to A.M. The court deferred making a finding and ordered the parties to brief aspects of ICWA and the Department's efforts.

**¶23** At the contested severance hearing, the juvenile court took judicial notice of all the testimony presented at M.M.'s dependency hearing and admitted the transcripts. The caseworker testified that the foster family was willing to adopt the children, and if they were unable to adopt, she would have no trouble finding another adoptive family. She also testified that adoption was in the children's best interests because then they would be able to grow in a home healthy, happy, and free from abuse.

**¶24** The children's psychologist testified that they were adoptable. Although the children had attachment issues, they were making progress in therapy and needed to be placed with a family willing to help them build strong primary bonds. She also testified that the children needed to feel safe and secure for their emotional growth. The case manager testified that adoption was in the children's best interests because then they would be able to grow in a home free of abuse.

**¶25** The children's psychologist, child abuse expert, and case manager all testified that A.M. and M.M. would be at risk of physical abuse if they remained in the parents' care. The juvenile court terminated Mother and Father's parental rights on ground of neglect and willful abuse and found that termination was in the children's best interests. It also found that the Department had made active efforts to prevent the family's breakup as ICWA required, but the efforts were unsuccessful. Mother and Father timely appealed.

## DISCUSSION

As relevant to our disposition of this appeal, Mother and Father argue that the juvenile court erred in terminating their parental rights to A.M. and M.M. on ground of neglect and willful abuse and in finding that termination was in the children's best interests and that their continue custody of A.M. would likely result in serious emotional or physical damage to the child. Father also argues that the court erred in finding that the Department made active and reasonable efforts to prevent the family's breakup as ICWA required and that he was denied due process in A.M. and M.M.'s severance proceedings because the Department

allowed J.C. to be adopted before the termination hearing. Because reasonable evidence supports the juvenile court's order and findings, the court did not abuse its discretion in terminating Mother and Father's parental rights to A.M. and M.M.

## 1. Termination of Parental Rights

**¶26** Mother and Father argue that insufficient evidence supports the juvenile court's order terminating their parental rights to the children and its finding that termination was in the children's best interests. We review a termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 59 ¶ 9, 344 P.3d 842, 844 (App. 2015). We accept the juvenile court's factual findings unless no reasonable evidence supports them, and we will affirm a severance order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1, 200 P.3d 1003, 1005 (App. 2008). Further, we will affirm the termination if any statutory ground is proven and if termination is in the children's best interests. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377 ¶ 14, 231 P.3d 377, 381 (App. 2010). The juvenile court did not abuse its discretion in terminating Mother and Father's parental rights on ground of neglect and willful abuse and finding that termination was in the children's best interests.

## 1a. Statutory Ground for Termination

**¶27** Mother and Father first argue that the evidence does not support the juvenile court's order terminating their parental rights to A.M. and M.M. A parent's right to care, custody, and control of his or her children has long been recognized as fundamental, but that right is not absolute. *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 78 ¶ 6, 117 P.3d 795, 797 (App. 2005). The State may terminate a parent's fundamental right to a child under statutorily enumerated conditions after following specified procedures. *Id.*

**¶28** The juvenile court may sever a parent's rights to a child if the parent has "neglected or willfully abused a child." A.R.S. § 8–533(B)(2). "Abuse" is "serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." *Id.* As relevant, "neglect" is "the inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8–201(24)(a).

**¶29** Parents who abuse or neglect their children, or who permit another person to abuse or neglect their children, can have their parental rights to their other children terminated even if no evidence shows that the other children were abused or neglected. *Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 299 ¶ 17, 339 P.3d 1040, 1044 (App. 2014). When the ground for termination is based on abuse of another child, however, the Department "must show a constitutional nexus between the prior abuse and the risk of future abuse" to the children at issue. *Id.* That nexus may exists when evidence of recent abuse of another child is available and the circumstances contributing to that abuse continue to exist, which creates a risk of future abuse to the children at issue. *See Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 286–87 ¶¶ 19–20, 257 P.3d 1162, 1166–67 (App. 2011) (finding sufficient constitutional nexus to terminate father's rights to child born nine months after termination of his rights to other child where circumstances of prior abuse persisted).

**¶30** Here, reasonable evidence supports the juvenile court's termination of Mother and Father's parental rights on ground of neglect and willful abuse and a constitutional nexus existed between J.C.'s prior abuse and the risk of future abuse to A.M. and M.M. The record shows that while in the parents' sole custody and care, J.C. suffered three traumatic injuries: a displaced hip, a fractured humerus, and a fractured scapula. J.C.'s treating physicians concluded that each of the injuries required a significant amount of force inflicted on the child and would have caused him a considerable amount of pain.

**¶31** In response to the parents' explanation that J.C.'s hip was injured when Father dropped him upon picking him up from his bed, one physician testified that such a short fall would not have displaced J.C.'s hip. The doctor explained that if that had happened, the child would not have been able to walk afterwards. Although the child's hospital discharge papers stated that the hip displacement was because of an "accidental trauma," the child abuse expert opined that the injury could have been either accidental or inflicted. She noted, however, that such an injury was uncommon for a child under five. She also questioned Father's explanation that the child was able to walk afterwards. J.C.'s treating physician testified that he continued to treat the child's hip and shoulder because he was concerned about "possible joint destruction" and "injuries to the growth plates." He also testified that the child has not suffered any further dislocations or fractures after being removed from the parents' care.

**¶32** Moreover, the child abuse expert testified that the parent's failure to seek any medical treatment for J.C.'s scapular fracture and to seek

prompt medical treatment for his humerus fracture caused an unreasonable risk of harm to the child's health and welfare. She explained that without prompt medical treatment, the bone fragments would have likely continued to move, resulting in considerable pain, additional bleeding, and tissue damage. She also explained that the child would have started crying or whimpering within 15 to 30 minutes of sustaining the fractures and that he would have been in considerable pain for another week until the bone stabilized. She opined that a reasonable parent would have known that something was wrong because the child would have difficulty moving his arm.

¶33         Although Mother and Father suggested—with varying details—several reasons for J.C.'s injuries, the child abuse expert testified that none of the explanations the parents proffered could have caused the scapular or humerus fractures. She explained that breaking the child's growth plate required specific, blunt force directly to it while another force was holding the bone still. She also explained that the scapular fracture was caused by a "very high energy, blunt force trauma." The expert opined that in child abuse cases, parents commonly either could not provide any explanation for the injuries or provided a minimal explanation that by itself could not account for the injury. Mother and Father tried both.

¶34         Moreover, J.C. consistently reported to a forensic interviewer and his foster mother that his parents had abused him. His disclosures were spontaneous and age-appropriate, including saying that "daddy broke" and grabbed his butt and "mommy broke" and grabbed his arm. He also told his foster mother that Mother had bitten and slapped him. Consistent with this statement, the hospital staff noted scratches on his neck and chin and a bite mark on his right cheek when J.C. was being treated for his hip dislocation. The parents gave conflicting explanations, however. Mother said that J.C. did not intentionally scratch himself when he was upset, yet this was the explanation Father gave to the hospital staff. Further, J.C.'s behaviors at his foster home indicated that he had been abused and neglected; he had emotional outbursts, hoarded food, and experienced night terrors and enuresis.

¶35         Additionally, a constitutional nexus existed between J.C.'s prior abuse and the risk of future abuse to A.M. and M.M. The record shows that J.C. suffered three severe injuries over a one-year period while in the parents' exclusive care and control. Mother and Father refused to acknowledge that J.C. suffered non-accidental trauma, however, and denied any knowledge of or responsibility for J.C.'s injuries. They also refused to acknowledge that the other parent could have abused J.C. and

admitted that if A.M. and M.M. were returned to them, they would leave the children with the other parent. Further, several individuals closely involved with treating of the children and the parents—including the children's psychologist, the parent's psychologist, the child abuse expert, and the case manager—opined consistently that the children would be at risk of physical abuse if they remained in the parents' care. Specifically, the child abuse expert testified that any child in the parents' care would be at a "significant risk of physical injury." Thus, a sufficient nexus existed between the prior abuse and the risk that such abuse would occur to A.M. and M.M. Consequently, reasonable evidence supports the juvenile court's order terminating Mother and Father's parental rights to A.M. and M.M. on ground of neglect and willful abuse.

### 1b. The Children's Best Interests

¶36            Mother and Father next argue that the evidence does not support the juvenile court's finding that termination was in the children's best interests. A finding of one of the statutory grounds for severance under A.R.S. § 8–533, standing alone, does not permit termination of parental rights; severance must also be in the children's best interests. A.R.S. § 8–533(B). Severance of parental rights is in the children's best interests if the children would either benefit from the termination or be harmed by the continuation of the parent-child relationship. *Id.* In determining whether the children would benefit, relevant factors include whether the placement is meeting the children's needs, an adoption plan is in place, and the children's adoptability. *See Tina T.*, 236 Ariz. at 300 ¶ 19, 339 P.3d at 1045; *Mario G.*, 227 Ariz. at 288 ¶ 26, 257 P.3d at 1168. The juvenile court need only find by a preponderance of the evidence that termination is in the children's best interests. *Kent K.*, 210 Ariz. at 288 ¶ 41, 110 P.3d at 1022.

¶37            Here, reasonable evidence supports the juvenile court's finding that termination was in the children's best interests. The children's caseworker testified that the foster family was willing to adopt them, and if the family could not, she would have no problem finding another adoptive family. Both she and the case manager testified that termination was in the children's best interests because then they would be able to grow in a home free from abuse. The children's psychologist testified that they were adoptable and that they were making progress in therapy and needed to be placed with a family that was willing to help them build strong primary bonds. Consequently, reasonable evidence supports the juvenile court's finding that termination was in the children's best interests.

### 2. The Indian Child Welfare Act

**¶38** Mother and Father also contend that the juvenile court erred in finding that their continuing custody of A.M. would likely result in serious emotional or physical damage to the child as ICWA required. We review the juvenile court's application of the federal statute de novo. *Jared P. v. Glade T.*, 221 Ariz. 21, 24 ¶ 17, 209 P.3d 157, 160 (App. 2009). ICWA requires that an order terminating a parent's rights to an Indian child include "a determination, supported by evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The expert testimony's subject matter must be "forward looking—relating to the likelihood of future harm to the child." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 571 ¶ 19, 190 P.3d 180, 185 (2008). However, "ICWA does not require that the expert's testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion." *Id.* at ¶ 20. The expert need not recite specific language from ICWA, nor does the testimony need to be expressed in a particular way. *Id.* at 572 ¶ 22, 190 P.3d at 186.

**¶39** Here, reasonable evidence supports the juvenile court's finding that the parents' continuing custody of A.M. was likely to result in serious emotional or physical damage to him. The record shows that the child abuse expert served as the Department's ICWA expert. She testified that any child would be at risk of physical abuse in Mother and Father's care. She opined that J.C. suffered at least two, possibly three, serious inflicted injuries while in their exclusive care. She further opined that any child in their care was therefore "at risk for the same treatment." Further, both Mother and Father refused to acknowledge that the other parent could have abused J.C. and testified that if the children were returned to their care, they would leave them in the other parent's care. Most notably, Mother testified that she would "probably not" believe A.M. if he told her that someone was abusing him. Consequently, reasonable evidence supports the juvenile court's finding that the parents' continuing custody of A.M. was likely to result in serious emotional or physical damage to him.

**¶40** Father also argues that the juvenile court erred in finding that the Department made reasonable and active efforts to prevent the breakup of the Indian family as ICWA required. But Father waived this argument because he provides no references to the record and cites no legal authorities for review to support this contention. *See* Ariz. R. Civ. App. P. 13(a)(7) (providing that an argument "must contain . . . contentions

concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies"); *State v. Felkins*, 156 Ariz. 37, 38 n.1, 749 P.2d 946, 947 n.1 (App. 1988) (claim abandoned when not supported by sufficient authority).

**¶41**		Despite the waiver, the record shows that the Department made active and reasonable efforts to provide remedial services and rehabilitative programs to prevent the breakup of the family. The services included parent aide services, supervised visitation, two psychological evaluations, a bonding/best interests evaluation, master-level counseling, Ph.D.-level counseling, counseling for the children, Interstate Compact on the Placement of Children requests, a rapid response evaluation, services through Arizona Early Intervention Program, and monetary allowances. Although the Department's efforts did not prevent the family's breakup, the efforts were nonetheless active and reasonable. Consequently, the record supports the juvenile court's finding that the Department provided active and reasonable efforts to prevent the breakup of the family.

### 3. Father's Due Process

**¶42**		Father also contends that he and Mother were denied due process because the Department permitted J.C. to be adopted before the severance hearing, which prevented them from obtaining further medical evidence on the child. We review constitutional claims de novo, *State v. Nordstrom*, 230 Ariz. 110, 117 ¶ 27, 280 P.3d 1244, 1251 (2012), but because Father raises the due process claim for the first time on appeal, we review for fundamental error only, *see Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239 ¶¶ 15–16, 282 P.3d 437, 440 (App. 2012). Father therefore bears the burden of establishing that error occurred, the error was fundamental, and the error caused him prejudice. *Id.* at 239 ¶ 16, 282 P.3d at 440.

**¶43**		Here, Father cannot show error because he does not provide any authority—and this Court has been unable to find any—that requires that the Department delay J.C.'s adoption and make the child available for medical testing. Father's argument contravenes the state's authority to regulate and expedite the adoption of neglected and willfully abused children to promote their well-being. *See Matter of Appeal in Pima Cty. Juvenile Severance Action No. S-114487*, 179 Ariz. 86, 97, 876 P.2d 1121, 1132 (1994) ("The law favors rapid placement so that the child can bond with those who will be the legal parents and not with those from whom the child may be taken. This sound policy benefits the child, the natural parents, the prospective adoptive parents, and society."); *Michael J. v. Ariz. Dep't of Econ.*

*Sec.*, 196 Ariz. 246, 249 ¶ 16, 995 P.2d 682, 685 (2000) (providing that prompt finality in severance proceedings is paramount to protect the child's interests).

**¶44**      Regardless whether the juvenile court erred, Father cannot show prejudice. On appeal, Father merely argues that the parents could not perform "any independent medical evaluations" and fails to specify what additional testing could have been performed and how the testing would have affected the trial's outcome. The record shows, however, that J.C. engaged in a number of medical evaluations and Father and Mother had access to all his medical documents. For example, the child was tested for possible genetic disorders, including metabolic bone disorder and connective tissue disorder, and underwent a genetic evaluation to rule out a possible "syndrome, metabolic issue, or connective tissue issue" that might explain the multiple bone fractures. J.C. also underwent testing for brittle bone disease, which were negative for the disease. Moreover, the child abuse expert testified that J.C.'s test results ruled out any type of genetic disorder and the child's treating physician testified that no further genetic testing was needed because J.C.'s pattern of injuries was inconsistent with a metabolic or connective tissue disorder.

**¶45**      Because the record shows that J.C. engaged in a number of medical evaluations regarding his physical state, Father cannot demonstrate that he was denied due process or that he was prejudiced. Consequently, the juvenile court did not abuse its discretion because reasonable evidence supports its order terminating Mother and Father's parental rights to A.M. and M.M. and finding that termination was in the children's best interests.

**CONCLUSION**

**¶46**      For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama