NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TROY W., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, T.W., *Appellees.*

No. 1 CA-JV 20-0261
FILED 2-25-2021

Appeal from the Superior Court in Maricopa County
No.  JD 531888
The Honorable Kristin Culbertson, Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Thomas Jose
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge David D. Weinzweig joined.

---

**B R O W N**, Judge:

¶1   Troy W. ("Father") appeals the juvenile court's order terminating his parental rights to his son, T.W., born in 2010. Father argues the court erred in finding (1) there was jurisdiction to issue the order, (2) DCS proved the ground of abandonment, and (3) termination was in the child's best interests. For the following reasons, we affirm.

## BACKGROUND

¶2   Father was T.W.'s primary caregiver for the first five months of T.W.'s life. When T.W. was about one year old, Father was charged with robbery and incarcerated for 14 months. After his release, he resumed the role of a caregiver, residing with T.W. and the biological mother ("Mother").[1] But soon thereafter, the Alaska Office of Children's Services removed T.W. from the home, alleging Father punched T.W. and that both parents were using drugs and involved in sex trafficking.

¶3   In 2015, while T.W. was still in care, Father was arrested for sex-trafficking and remained incarcerated until he was sentenced to prison in 2017. A month later, T.W. was returned to Mother's care. In 2018, Mother and T.W. moved to Arizona, and a short time later Mother left T.W. in the care of a homeless woman who was under the influence of methamphetamine. The Department of Child Services ("DCS") removed T.W. from Mother's care and filed a dependency petition as to both parents. DCS alleged that although Alaska was still T.W.'s home state, the juvenile court could assert temporary emergency jurisdiction under A.R.S. § 25-1034. Two months later, DCS asked the juvenile court to conduct a conference with the Alaska court to resolve jurisdiction, recognizing that while T.W. could remain in foster care pursuant to temporary emergency

---

[1]  The juvenile court also terminated Mother's parental rights to T.W., but she is not a party to this appeal.

jurisdiction, the juvenile court could not exercise initial child custody jurisdiction until Alaska declined jurisdiction.

¶4            In November 2018, the juvenile court conducted an unrecorded telephonic conference with Judge Aarseth of the Alaska superior court.  The juvenile court issued a minute entry stating that both courts agreed Arizona would "assume full jurisdiction of the child custody matter," but the Alaska court would retain jurisdiction over a prior "[c]ustody [j]udgment."  At that time, no objections were made to the jurisdictional finding, and Father later pled no contest to the dependency petition.

¶5            In December 2019, DCS moved to terminate Father's parental rights based on abandonment and length of sentence for a felony conviction.  At the first termination hearing, Father admitted he had not physically seen T.W. since 2015 but stated he had spoken to T.W. on the phone "[p]robably about eight to 10 times."  Father admitted he had not sent cards or letters but asserted he did not know where to send them. The DCS case manager testified that to her knowledge, there had been no contact between Father and T.W. since at least 2015, and that a family in Alaska was interested in adopting T.W.

¶6            After reviewing the record, the juvenile court explained that jurisdiction may have been resolved as stated in the 2018 minute entry, *supra* ¶ 4, but it was nonetheless concerned with "the lack of findings made in compliance with the UCCJEA."  To resolve the issue, the juvenile court conducted a second conference with the Alaska court in July 2020.  After discussing the matter with Judge Morse, the juvenile court issued a detailed minute entry in July 2020, which included the following:

> It appears Judge Aarseth declined jurisdiction of the juvenile dependency proceedings on November 7, 2018. . . . To the extent the record is unclear regarding the basis of the November 7, 2018, Minute Entry, Judge Morse specifically declined jurisdiction of the juvenile dependency proceedings, on July 21, 2020, noting Arizona was a more appropriate forum.

The court also explained that "should any party want a formal UCCJEA Evidentiary Hearing, on the record, with Judge Morse, they must file a written motion **no later than August 7, 2020, with a courtesy copy to chambers**."  No such motions were filed.

¶7        Father was released from incarceration in July 2020, and a second evidentiary hearing was held the following month.  Father did not attend.  The case manager testified that the potential adoptive family in Alaska had asked to be withdrawn; however, a "matchmaking specialist" was working on finding a potential adoptive family, and the case manager still believed termination was in T.W.'s best interests.  The juvenile court granted DCS's motion based on abandonment and found termination was in T.W.'s best interests.  Father timely appealed.

## DISCUSSION

### A.        Subject Matter Jurisdiction

¶8        Jurisdiction over child custody matters is governed by the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), which has been "adopted in all 50 states and the District of Columbia." *Angel B. v. Vanessa J.*, 234 Ariz. 69, 72, ¶ 7 (App. 2014).  The UCCJEA applies to any "child custody proceeding, including 'dependency' and 'termination of parental rights.'"  A.R.S. § 25-1002(4)(a); A.S. § 25.30.909(4).  Under the UCCJEA, the child's "home state" has original jurisdiction over initial child custody determinations. A.R.S. § 25-1031(A)(1); A.S.  § 25.30.300(a)(1).  The child's home state is "[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding."  A.R.S. § 25-1002(7)(a); *see* A.S. § 25.30.909(7).  A state that has already made an initial custody determination "has exclusive, continuing jurisdiction over the determination" subject to limited statutory exceptions.  A.R.S. § 25-1032; A.S. § 25.30.310.  We review de novo whether the juvenile court has subject matter jurisdiction to terminate parental rights. *Angel B.*, 234 Ariz. at 71, ¶ 6.

¶9        Father questions whether the juvenile court had jurisdiction to rule on the dependency petition.  We acknowledge the court's initial jurisdictional order did not detail the reasons why Alaska had purportedly declined jurisdiction, and the court did not cite statutory grounds for asserting jurisdiction over the dependency proceedings.  As a general rule, the basis on which an Arizona court asserts jurisdiction in custody matters must be a part of the record.  *Id*. at 74, ¶ 17.  However, a finding of dependency is an appealable order, separate from a termination order. *See Lindsey M. v. Ariz. Dep't. of Econ. Sec.*, 212 Ariz. 43, 45, ¶ 8 (App. 2006).  Because Father did not file a timely appeal from the juvenile court's 2018 dependency ruling, we lack jurisdiction to address whether the juvenile court lacked jurisdiction to rule on the dependency.  *See In re Marriage of*

*Thorn*, 235 Ariz. 216, 218, ¶ 5 (App. 2014) ("[T]his court only acquires jurisdiction over those matters identified in a timely filed notice of appeal.").

**¶10**　　　　Addressing the termination order, Father argues the juvenile court erred in concluding jurisdiction existed under the UCCJEA. It is undisputed that Alaska was T.W.'s home state at the time DCS filed the dependency petition, as T.W. had not lived in Arizona the required six months to establish Arizona as the new home state. And because the Alaska court had already made an initial custody determination, there is no dispute that Alaska had exclusive, continuing jurisdiction over T.W.'s custody. Thus, the juvenile court could not make a custody determination modifying the Alaska ruling unless A.R.S. § 25-1033 applied:

> [The juvenile court] has jurisdiction to make an initial determination under § 25-1031, subsection A, paragraph 1 or 2 and either of the following is true:
>
> 1. The court of the other state determines that it no longer has exclusive, continuing jurisdiction under § 25-1032 or that a court of this state would be a more convenient forum under § 25-1037.
>
> 2. A court of this state or a court of the other state determines that the child, the child's parents and any person acting as a parent do not presently reside in the other state.

*See also* A.S. § 25.30.320; *Angel B.*, 234 Ariz. at 73, ¶ 15. In finding that it had jurisdiction, the juvenile court erroneously cited § 25-1031 as the statutory grounds. Because the Alaska court had continuing, exclusive jurisdiction pursuant to § 25-1032, the juvenile court needed to find jurisdiction under § 25-1033. Satisfying § 25-1031, which on its own only authorizes an Arizona court to make an *initial* child custody determination, is only part of the analysis. However, the tests under § 25-1033 and § 25-1031 are functionally the same when the foreign jurisdiction declines jurisdiction on forum convenience grounds. *See infra* ¶ 12. Thus, the court's error is harmless.

**¶11**　　　　On the first requirement of § 25-1033, the juvenile court explicitly found it had jurisdiction to make an initial custody determination under § 25-1031(A)(2). In relevant part, § 25-1031(A)(2) states that an Arizona court has jurisdiction to make an initial child custody determination if:

> [A] court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under § 25-1037 or 25-1038 and both of the following are true:
>
> (a) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.
>
> (b) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

¶12        In its July 2020 minute entry, the juvenile court reported that it discussed the convenience of forum factors under A.R.S. § 25-1037 with the Alaska court and that court specifically declined jurisdiction over the dependency proceedings because "Arizona was a more appropriate forum."  The juvenile court also determined "at least one parent or a person acting as a parent, [has] a significant connection with this state other than mere physical presence" and "substantial evidence is available in this state concerning the child's care, protection, training and personal relationships."

¶13        Addressing the second requirement under § 25-1033, the juvenile court did not explicitly state that the additional conditions in either § 25-1033(1) or (2) were met.  However, § 25-1033(1) is satisfied if the foreign court declines jurisdiction because Arizona would be the more convenient forum under § 25-1037.  As noted, convenience of the forum was the reason the Alaska court declined jurisdiction for the purpose of allowing the juvenile court in Arizona to make custody decisions.  Therefore, § 25-1033(1) was necessarily satisfied, even if the juvenile court did not explicitly say so.

¶14        Notwithstanding the apparent compliance with § 25-1033, Father nonetheless argues the juvenile court erred when it found it had jurisdiction over the dependency proceedings.  First, although Father concedes the July 2020 minute entry shows Arizona and Alaska held a conference on jurisdiction, he argues "the record is not complete and is insufficient to sustain a finding that Arizona has jurisdiction to issue a severance order."  Father suggests, because of the lack of an official order from the Alaska court and the absence of transcripts from the inter-court conferences, this court cannot conduct a proper appellate review, requiring reversal of the termination order.

¶15 We are not persuaded. In *Angel B.*, we described two ways a record is sufficient to show a foreign court has declined jurisdiction. 234 Ariz. at 74, ¶¶ 18–20. First, the record may include an order by the foreign court relinquishing jurisdiction. *Id.* at ¶ 19. If not, the record could show the Arizona court conferred with the foreign court to resolve the jurisdictional issue, and a record of the communication was made available to the parties. *Id.* at ¶ 20; A.R.S. § 25-1010 (outlining procedures for communication between courts); A.S. § 25.30.860(d). Here, the juvenile court's minute entry summarizing the contents of the conference satisfies the record requirement of § 25-1010. *See* UCCJEA § 110 cmt., 9 U.L.A. 657 (1999) ("A record includes . . . a memorandum or an electronic record made by a court after the communication."). Thus, the record before us is sufficient to determine whether the juvenile court properly found it had jurisdiction to make an initial custody determination under § 25-1031.

¶16 Father also contends that § 25-1033 required the juvenile court to determine that Arizona is the "more convenient" forum under § 25-1037, pointing to the phrase "appropriate forum" used in the July 2020 order. That order makes it clear both courts considered all relevant factors under § 25-1037, which governs when a court should decline jurisdiction because it is an "inconvenient forum." *See also* A.S. § 25.30.360. Read in context, finding that Arizona was the more "appropriate" forum under § 25-1037 has the same meaning as finding it was the more "convenient" forum.

¶17 Next, Father asserts the 2020 jurisdictional order is an improper attempt to retroactively find that the juvenile court had the necessary jurisdiction to adjudicate the motion for termination. *See Monique B. v. Duncan*, 245 Ariz. 371, 376, ¶ 17 (App. 2018) (holding that jurisdictional orders do not apply retroactively). To be sure, the 2018 order lacks detailed jurisdictional findings, and on its own may not be sufficient to establish the court's authority to rule on the severance petition. However, the July 2020 order plainly establishes the court's jurisdiction over the dependency proceedings, including the motion for termination. The order outlines the juvenile court's findings in enough detail to enable this court to confirm that the juvenile court complied with the statutory requirements of the UCCJEA. The order was entered before the juvenile court ruled on the motion, and significantly, Father did not avail himself of the opportunity the court gave him to request a full UCCJEA hearing. He therefore waived his ability to challenge the sufficiency of the record. *See Trantor v. Fredrikson*, 179 Ariz. 299, 300 (1994) ("[A]bsent extraordinary circumstances, errors not raised in the trial court cannot be raised on appeal" because "a

trial court and opposing counsel should be afforded the opportunity to correct any asserted defects[.]").

**¶18** In sum, whatever defects were present in the 2018 jurisdictional order are not before us. Contrary to Father's assertion, the July 2020 order was not an attempt to retroactively fix jurisdiction. Rather, the juvenile court was ensuring that it properly established jurisdiction before ruling on DCS's motion for termination. We conclude the juvenile court had jurisdiction under the UCCJEA to decide the motion.

### B. Abandonment

**¶19** Father challenges the juvenile court's finding that DCS proved the abandonment ground by clear and convincing evidence. "To support an order terminating parental rights, the [juvenile] court must find at least one statutory ground by clear and convincing evidence." *Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 4 (App. 2017). We will affirm a severance order unless there is an abuse of discretion or the findings of fact were clearly erroneous. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We do not reweigh the evidence because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

**¶20** "Abandonment" is defined as:

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1).

**¶21** Whether a parent has abandoned his or her child is determined by the parent's objective conduct, not subjective intent. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 18 (2000). A parent "must act persistently to establish the relationship however possible and must vigorously assert . . . legal rights to the extent necessary." *Id.* at 250, ¶ 22 (quoting *Pima County Juv. Action No. S-114487*, 179 Ariz. 86, 97 (1994)). Although imprisonment is a relevant consideration in determining

abandonment, incarceration alone "does not justify a failure to make more than minimal efforts to support and communicate with his child." *Id.* at ¶ 21. "[T]he court's determination of reasonable support, regular contact and normal supervision will depend on the circumstances of the particular case." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 19 (App. 2010).

**¶22** Father argues the juvenile court did not properly take into consideration evidence weighing against a finding of abandonment. Father points to portions of his trial testimony suggesting he had a relationship with T.W. in the past and he attended some of the hearings. He also refers to his explanation at trial that he was unable to find or contact T.W. because he was incarcerated and never actually received the service letters from DCS. Contrary to Father's contentions, the juvenile court considered those circumstances.

**¶23** The juvenile court did not find the time Father spent caring for T.W. significant, as it was only a few months when T.W. was not even a year old. The court noted that although Father did attend several hearings, he never made an effort to obtain the child's contact information. Moreover, the court did not find credible Father's explanations for his failure to contact T.W. On the other hand, the court found credible the case manager's testimony that several efforts were made to encourage Father to have contact with T.W., but Father had made no contact with him since 2015. The court also found, "[a]t best, Father parented [T.W.] for approximately six to eight months of the child's ten years." The record supports these findings. The juvenile court did not err when it found that Father had abandoned his child by clear and convincing evidence.

### C. Best Interests

**¶24** Father also challenges the juvenile court's finding that DCS proved by a preponderance of the evidence termination was in T.W.'s best interests. Father argues the court did not establish how T.W. would benefit from termination or be harmed by Father's continued involvement.

**¶25** Termination is in a child's best interests if "the totality of the circumstances" establishes that the child will either benefit from the termination or be harmed if it is denied. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018); *see also Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4, ¶ 12 (2016) (noting that relevant factors include whether (1) current placement is meeting child's needs, (2) an adoption plan is in place, and (3) the child is adoptable). "The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not

dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 12 (App. 2016). "The 'child's interest in stability and security' must be the court's primary concern." *Alma S.*, 245 Ariz. at 150, ¶ 12 (citation omitted).

**¶26** Father argues the juvenile court relied on mere conclusory testimony from the case manager and that it failed to properly consider the extent to which the parental bond could be nurtured and developed in the future. The court recognized T.W. was not currently in an adoptive placement but nonetheless determined termination was in his best interests because it would make him eligible for adoption, allowing him to achieve permanency and stability. The court also noted T.W. was currently placed in a group home, which was "the least restrictive environment available to meet the needs of the child." Further, the court found that Father and T.W. did not have a bond, considering Father was incarcerated for most of his son's life.

**¶27** These findings are supported by the record, as the case manager testified that T.W. was living in a therapeutic group home and had access to services to address his special needs and emotional issues. The record also supports DCS's conclusion that T.W. was adoptable. Although the case manager explained that the plan for working with an adoptive family in Alaska was no longer an option, T.W. is adoptable, and a specialist is looking for potential adoptive placements. Thus, the juvenile court did not merely rely on conclusory statements by the case manager or fail to consider the relevant best interest factors in reaching its decision.

## CONCLUSION

**¶28** We affirm the juvenile court's order terminating Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED: AA