NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MATTHEW B., AMANDA R., *Appellant*s,

*v.*

DEPARTMENT OF CHILD SAFETY, J.B., *Appellee*s.

No. 1 CA-JV 20-0415
FILED 7-27-2021

Appeal from the Superior Court in Maricopa County
No.  JD 23403
The Honorable Lori H. Bustamante, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, Scottsdale
*Counsel for Appellant, Father*

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant, Mother*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Samuel A. Thumma and Chief Judge Kent E. Cattani joined.

---

**C A M P B E L L**, Judge:

¶1          Amanda R. ("Mother") and Matthew B. ("Father") appeal the superior court's order terminating their parental rights to their son, Peter, born in June 2019.[1] They argue that the trial court erred in finding the statutory grounds for severance were met and that severance was in Peter's best interests. Because reasonable evidence supports the court's decision, we affirm.

**BACKGROUND**

¶2          Mother and Father both have a history of drug abuse. In a prior severance case, the Department of Child Safety ("DCS") presented evidence that Mother's older son was born exposed to amphetamine. Ultimately, Mother's parental rights to her older son were terminated because of her failure to overcome substance abuse issues, among other things. Both Mother and Father also have a significant felony history. In late 2017, Mother was sentenced to 11 months in prison after violating probation. Mother was released on community supervision but soon absconded.

¶3          In June 2019, Phoenix police were assisting DCS's investigation into the disappearance of Mother's nephew, a child. As part of that process, authorities investigated the whole family, suspecting the nephew was being hidden from DCS. After pulling Mother over, police discovered the boy in Mother's care. When found, the nephew's teeth were rotted to the gum line, he was unable to speak and appeared to be in pain. After being taken into care, he had to have 14 of the 20 teeth remaining in his mouth removed. He also tested positive for methamphetamine. An officer interviewed Mother and later testified that Mother claimed to have been caring for her nephew since her release from prison. Mother later denied saying this, claiming she only picked the boy up that day. Although

---

[1]          We use a pseudonym throughout for the child to protect his identity.

Mother had absconded, she was not arrested that day because she was pregnant with Peter.

¶4 Mother gave birth to Peter at home, and both were taken to the hospital. The next day, Mother tested positive for amphetamine and Peter tested positive for methamphetamine. At the time, there was an outstanding warrant for Mother's arrest, and she left Peter at the hospital to avoid being arrested. DCS attempted to contact Mother for several weeks, but the attempts were unsuccessful. Eventually, DCS contacted Mother and arranged for a meeting. Mother did not show up for the meeting, however, and when the caseworker called Mother to see why she was not there, Mother hung up on the caseworker and then refused to answer subsequent calls.

¶5 After Peter's birth, Father also left the hospital and never returned for the baby. A DCS caseworker attempted to interview Father, but he refused to meet without Peter's maternal grandmother ("Grandmother") present. During the interview, Grandmother repeatedly interrupted and prevented Father from answering questions. The caseworker terminated the interview because of Grandmother's interference. Father became upset and left. Ultimately, DCS took Peter into custody, placed him in a licensed foster care home, and filed a dependency petition.

¶6 At a preliminary protective hearing in July 2019, Father refused to meet with his attorney without Grandmother present and left before the hearing. Because DCS was unable to contact either parent, DCS served them by publication. The court adjudicated Peter dependent in October 2019 and adopted a case plan of family reunification.

¶7 Also in October 2019, Phoenix Police located Mother and Father in their car. It appeared they were living in the vehicle. Mother was arrested on multiple outstanding warrants, and in a subsequent search of the vehicle, officers discovered a sawed-off rifle. Mother incurred new charges for resisting arrest, aggravated assault, and possession of a firearm as a prohibited possessor. Father was also arrested for possession of a prohibited weapon and possession of a firearm as a prohibited possessor.

¶8 In January 2020, Father appeared at a dependency hearing and informed the court that Mother was in custody. The DCS case manager had attempted to locate Mother but had been unsuccessful, apparently because he had searched for her using her maiden name. In February 2020, the DCS case manager finally located Mother and set up a meeting at the

Maricopa County jail. Mother told the case manager that she was being released the following month. She asked how Peter was doing, but did not ask for visitation at that time. The case manager told Mother to contact him when she was released so services could be set up and gave her his business card.

¶9            However, Mother was not released in March. When she was released from the Maricopa County jail, she was transferred to the Pinal County jail because she had absconded while on probation in that county. Mother claims that she did not know about the Pinal County hold when she met with the DCS case manager and was unable to contact him because his business card was confiscated during the transfer. When Mother did not call in March, the case manager called the jail, which erroneously informed him that Mother had been released on bond. Mother did not contact DCS until May or June 2020.

¶10          Meanwhile, Father failed to engage in services or participate in visitation. In May 2020, police arrested Father on a bench warrant, and found heroin and Percocet in his possession. Shortly after, Father pleaded guilty to misconduct involving weapons stemming from the October 2019 incident, and he was sentenced to five years in prison.

¶11          In June 2020, after the superior court changed the case plan to severance and adoption, DCS moved to terminate both Mother's and Father's parental rights. The same month, Mother was released from jail to a halfway house in Casa Grande and contacted the DCS case manager. At the halfway house, she participated in substance abuse services, counseling, and drug testing. The DCS case manager put in a referral for supervised visits and a parent aide. Mother eventually moved out of the halfway house to a pay-by-week motel, and then to an apartment. Mother also obtained employment. At the time of trial, Mother was participating in services provided by the halfway house and was doing well with ongoing counseling. Mother had also stayed in consistent contact with DCS since her release.

¶12          In December 2020, the superior court held a severance trial. The DCS case manager testified that Mother had made progress and had demonstrated almost six months of documented sobriety. However, he opined that Mother was not in a position to safely parent Peter. The case manager pointed out that Mother had only demonstrated sobriety in a controlled environment, that she had lived in three different places since her release from jail, and that her nephew was found in poor condition

4

when discovered in her care. He also testified that Peter was "thriving" in his foster home and that the foster family was willing to adopt him.

¶13        After considering the evidence, the court terminated Mother's and Father's parental rights. The court found termination was warranted under the fifteen months' out-of-home placement ground as to Mother (A.R.S. § 8-533(B)(8)(c)), length of felony sentence ground as to Father (A.R.S. § 8-533(B)(4)), and abandonment ground as to both parents (A.R.S. § 8-533(B)(1)). The court also found termination was in Peter's best interests. Mother and Father timely appealed.

## DISCUSSION

¶14        We view the evidence and reasonable inferences therefrom in the light most favorable to sustaining the superior court's termination order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). This court will not, therefore, reweigh the evidence. *Jordan C.*, 223 Ariz. at 93, ¶ 18. We will affirm a termination order supported by reasonable evidence. *Id.*

¶15        "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005). But even fundamental rights are not absolute. *Id.* To terminate a parent's parental rights the superior court must find at least one statutory ground listed in A.R.S. § 8-533 by clear and convincing evidence, A.R.S. § 8-537(B), and find by a preponderance of the evidence that termination is in the child's best interests. *Kent K.*, 210 Ariz. at 288, ¶ 41.

## I.        Abandonment Grounds

¶16        Mother and Father both argue that the trial court erred by finding they had abandoned Peter.[2] The superior court may terminate a

---

[2]        Because sufficient evidence in the record supports termination based on abandonment, we need not address Mother's contention as to the fifteen months out-of-home placement ground, or Father's contention as to length of felony sentence ground. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002) (if evidence supports termination on any one statutory ground, this court need not consider challenges to the other grounds).

parent's rights if it finds by clear and convincing evidence that a parent has abandoned his child. A.R.S. § 8-533(B)(1). Abandonment, as defined by statute, "means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child." A.R.S. § 8-531(1). "[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249–50, ¶ 18 (2000). "What constitutes reasonable support, regular contact, and normal supervision varies from case to case." *Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 96 (1994).

¶17        Mother argues that she did not abandon her child. She claims she made several attempts to contact DCS shortly after her arrest in October 2019, but she could not reach them because the case manager would not accept a collect call from the jail. She contends that Grandmother spoke with the DCS case manager on her behalf. Mother claims she was the one to initiate contact in February 2020. Mother also testified that she tried to call the DCS case manager when she was unexpectedly transferred instead of being released from jail but had lost the case manager's contact information in the move. She claims that Grandmother again made contact with DCS on her behalf. Mother also points out that she had maintained consistent contact with DCS since her release in June 2020, after Peter had already been in DCS's custody for a year.

¶18        Mother's testimony notwithstanding, the superior court found that she had done nothing to establish a relationship with Peter for nearly a year, and reasonable evidence supports that conclusion. It is undisputed that Mother left Peter at the hospital in June 2019 and made no effort to contact DCS for the next several months. The DCS case manager testified that (contrary to Mother's assertions) he did not receive any calls from Mother before February 2020, and he asserted that he was the one who initiated contact. He also testified that DCS did not receive any calls or emails from Mother after the February 2020 meeting until the end of May or early June, when Peter was about a year old. *See* A.R.S. § 8-531(1) ("Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment."). Although Mother remained in contact with DCS after she was released from jail in June 2020, this progress came only after DCS had already moved to terminate Mother's parental rights. *See supra* ¶ 11; *see also Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 8 (1990) ("[A] prima facie case of abandonment cannot automatically be considered rebutted merely by post-petition attempts to reestablish a parental

relationship"). Thus, we affirm the superior court's abandonment finding regarding Mother.

**¶19** In a footnote in his opening brief, Father also argues the court erred by finding he abandoned his child. Father asserts that DCS never contacted him while he was incarcerated. He also notes that he had requested visitation in May 2020, and that the trial court had asked DCS to look into the matter, but DCS did not act on the request.

**¶20** "The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *See Michael J.*, 196 Ariz. at 251, ¶ 25. Father admits he has had no contact with Peter since his birth. It is undisputed that Father knew of the dependency but chose not to participate in court proceedings or take advantage of services for several months. Father made no effort to establish contact with Peter until May 2020, when Peter was almost a year old. Reasonable evidence supports the superior court's finding of abandonment regarding Father.

## II. Best Interests

**¶21** Severance is in a child's best interests if the child would "derive an affirmative benefit from termination or incur a detriment by continuing in the relationship." *Oscar O.*, 209 Ariz. at 334, ¶ 6 (App. 2004). "The 'child's interest in stability and security' must be the court's primary concern." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (citation omitted). Mother argues that, because of the progress she has made since her release from prison, the court erred in finding termination was in Peter's best interests. Father similarly argues that, because Mother is approaching a time where she could parent the child, and because Peter is young enough to forget his adoptive family, the court erred in finding termination of his rights were in Peter's best interests. Father appears to be arguing that Mother could care for the child in his place while he is incarcerated.

**¶22** Reasonable evidence supports the trial court's best interests determination. To be sure, Mother made significant progress after her release from jail. She successfully participated in services at the halfway house, and at the time of trial was in her own apartment, and had found employment. Mother also points out that her family members testified at trial that they believed she was in a position to successfully parent. The trial court acknowledged Mother's progress but deemed it insufficient in light of the totality of circumstances. As the superior court pointed out, Mother had previously put her needs over Peter's when she left him at the hospital

to avoid arrest, and Mother was facing charges that could lead to further incarceration. Also, the court expressed doubts about whether Mother could provide for Peter's safety, given the condition her nephew was in when found in her care. Moreover, the DCS case manager testified that Peter is in a placement that is meeting all of his needs and is willing to adopt him. *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016) ("When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests.").

**¶23** Because the trial court's best interests finding as to Mother is based on reasonable evidence, we affirm. Further, because Father's arguments were premised on wife's availability to safely parent in his place while he is incarcerated, we also affirm the court's finding as to Father.

## CONCLUSION

**¶24** For the foregoing reasons, we affirm the termination of the parental relationship regarding both Mother and Father.



AMY M. WOOD • Clerk of the Court
FILED: AA