NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

WALTER S., *Appellant*,

*v.*

ELISA P., E.S., *Appellees*.

No. 1 CA-JV 22-0055
FILED 9-29-2022

Appeal from the Superior Court in Maricopa County
No. JS519836
The Honorable Cynthia L. Gialketsis, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Berkshire Law Office PLLC, Tempe
By Keith Berkshire, Alexandra Sandlin
*Counsel for Appellant*

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellee Elisa P.*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge David D. Weinzweig and Judge D. Steven Williams joined.

---

**H O W E**, Judge:

¶1          Walter S. ("Father") appeals the juvenile court's denial of his petition to terminate Elisa P.'s ("Mother") parental rights. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          We view the facts in the light most favorable to sustaining the court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). Father and Mother were never married to each other but have one minor child in common, E.S., born in 2016. Mother has another minor child, Z.S., from another father, who is under the care of a permanent guardian. Mother has a history of trauma and sexual abuse. The parties lived together for the first year of E.S.'s life, and during their eight-year relationship, Mother served Father with an order of protection in 2017, which was one of several that are since inactive.

¶3          The case began in 2018 when Father petitioned for paternity. The parties came to an agreement regarding legal decision-making and parenting time. Initially, the parties agreed to share custody of E.S. every two days, which lasted four to five months. Police became involved multiple times for domestic disputes. In December 2018, Mother attempted suicide, which she had attempted before, while Z.S. was in her care and E.S. in Father's. The Department of Child Safety investigated, and the court ordered Mother to undergo a psychological evaluation. Dr. David Weinstock completed the evaluation in October 2019, which detailed Mother's history of trauma and sexual abuse, as well as her latest suicide attempt. She stated in the report that she had been fired from every job she had.

¶4          In March 2020, Mother moved to Florida for better financial opportunities and to distance herself from Father. Later that year, the parties stipulated to a parenting plan for sole legal decision-making and parenting time. In the parenting plan, the court ordered that Father would

have sole legal decision-making and be E.S.'s primary residential parent. Mother had supervised parenting time of two visits per week, up to two hours per visit. The order also provided that Mother could have "telephone, email, text, Skype or other contact" with E.S. one time a day when she did not have parenting time. If she left a voice message, "Father shall assist [E.S.] in returning the call as necessary." The parties agreed that the order did not obligate either one to pay child support.

¶5            In April 2021, Father petitioned to terminate Mother's parental rights on the grounds of abandonment and mental illness or mental deficiency. He alleged that Mother failed to contact E.S. since February 2020, that she did not provide the child with emotional support, gifts, cards, or other communications, and that she had unresolved mental-health issues preventing her from exercising parental responsibilities. He had since remarried and alleged that his wife ("Stepmother") acted as the child's mother and wished to adopt her. In late 2021, Father arranged through a child welfare agency for a social study of the parties. In the social study findings, Father explained that Mother left him 16 voicemails in 19 months. The social worker who conducted the study recommended that Mother's rights be terminated.

¶6            In late 2021, the court held a three-day contested termination hearing with all parties present. Father testified that around E.S.'s most recent birthday, Mother sent her a gift box with mechanical butterflies that flew out. He opined that it was not age appropriate and did not show it to E.S. He added that she had not sent any gifts other than two packages, one on E.S.'s birthday and one on Mother's Day that year. He testified that Mother had not seen E.S. since February 2020 and had only asked to see her in person two years ago. He added that he had blocked Mother's phone number so that they could communicate solely via email. She used email to send Father articles about daycare and write messages to E.S. like "Mommy loves you." He added that she never asked to video chat with E.S. or arranged to visit from Florida. He conceded, however, that Mother sent more than 20 emails asking about E.S. and for photos of her. He added that he never relayed her email messages to E.S. or discussed Mother with E.S. at all because she, at five years old, should not have to deal with the situation, especially since she had Stepmother in her life daily. He claimed that he was delaying contact between Mother and E.S. until Mother got mental-health treatment and completed drug testing, even though he knew that the stipulated order allowed Mother unconditional contact with E.S. He noted that he formed this opinion after talking with professionals about the right time to talk to E.S. about Mother. He added that E.S. and Stepmother, whom he married in April 2021, had a "mother-daughter

relationship." Stepmother testified that Father never discussed Mother with E.S. and that Mother never comes up in discussion because E.S. is "happy."

¶7 Dr. Weinstock testified about the 2019 psychological evaluation and that Mother showed symptoms of depression, panic and anxiety, and post-traumatic stress disorder. He was concerned that hypothyroidism may have contributed to her mental state. He agreed with his earlier recommendation that Mother see a psychiatrist to determine appropriate medications, start talk therapy to process her past abuse, domestic violence, substance-abuse concerns, and work on her parenting and nurturing skills. Polly Thomas, the social worker who completed the social study, testified that Mother had an abusive relationship with Father and that the parties still had animosity between them.

¶8 Mother testified that she moved to Florida to "start over" because she was "kicked out of [Father's] life." She noted that she had intended to work with cruise lines, but the pandemic interrupted her endeavor. Instead, she taught yoga, bartended, and worked in hospice care. She added that although she looked for employment in Arizona, it was not enough to afford all the medical expenses she needed for her mental health and thyroid problems. She further stated that she could not afford an attorney but did her best to "fight" Father through legal aid services. Once she could afford an attorney and not rely on a court-appointed one, she would enforce her parental rights in family court. She conceded that she had not provided E.S. with emotional or financial support from March 2020 to the time of trial, but that she sent emails pursuant to the parenting plan to see, speak, or see pictures of E.S. She testified that she wanted to see E.S. "eye to eye" and tried calling Father with her phone number and others', but the call went to voicemail.

¶9 Mother also testified that she sent E.S. an age-appropriate birthday gift of mini birthday cakes with butterflies that pop out of the box. She added that she sent Stepmother Mother's Day flowers with teddy bears for E.S. because she "thought it would be loving to give [Stepmother] something." She sent a Christmas card and Father cookies for Father's Day. She added that she wanted E.S. to have a relationship with Mother's family. She agreed that E.S. should stay with Father and Stepmother and did not want to "disrupt any current or future bond that [E.S.] has with [] [S]tepmother." Mother said that she herself was still "part of this equation." She testified that in Florida she focused on her health and financial stability, having talked with a therapist and psychiatrists and received necessary treatment for her thyroid condition. She did not provide documents for trial, however, because she did not think it relevant.

¶10      The court found that Father did not prove by clear and convincing evidence that Mother's parental rights should be terminated on the grounds of abandonment or her mental illness or deficiency. On the abandonment ground, the court recognized that Mother's move to Florida made day-to-day parenting difficult and that she would have maintained a stronger relationship with E.S. had she been able to have video and phone contact with her. The court found that Mother sent emails to communicate with E.S. because Father was blocking her phone calls. The court also recognized that the parties had a "relationship filled with animosity to the detriment of [E.S.]" but that the family court could continue to monitor the relationship of the parties and E.S. On the mental illness or mental deficiency ground, the court relied on Dr. Weinstock's October 2019 report and recognized that Mother had trauma and a suicide attempt and would benefit from treatment. The court also recognized from the report that Mother's mental-health issues may have stemmed from her thyroid issues. It found that she may be a risk to E.S. if she is unsupervised now, but she is working on her mental health and able to hold down two jobs. The court thus denied Father's petition, and he timely appealed.

## DISCUSSION

¶11      Father argues that the court erred (1) in relying on Mother's subjective intent in finding that she did not abandon the child, distinguishing this case from *Calvin B. v. Brittany B.*, 232 Ariz. 292 (App. 2013), and (2) in failing to determine whether termination was in the child's best interests. He does not appeal the finding on the mental illness ground. We will affirm the court's ruling unless no reasonable evidence exists to support the order. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004). Because the juvenile court was in the "best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings," *In re Pima Cnty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987), we will affirm the juvenile court's order unless the factual findings are clearly erroneous, *see Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997), and we will not reweigh the evidence unless no reasonable evidence supports the findings, *see Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002).

¶12      Parents have a "fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 24 (2005). To terminate parental rights, the juvenile court must find the existence of at least one statutory ground under A.R.S. § 8–533 by clear and convincing evidence and must find that termination is in the child's best interests by a preponderance of the evidence. A.R.S. § 8–533(B);

Ariz. R.P. Juv. Ct. 66(C); *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). One such ground is abandonment, A.R.S. § 8–533(B)(1), which means

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment,

A.R.S. § 8–531(1).

¶13 A finding of abandonment requires the court to consider whether a parent has (1) provided reasonable support to the child, (2) maintained regular contact with her, and (3) provided normal supervision. *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37 ¶ 18 (App. 2010). In assessing the evidence, the court should also consider whether "the parent has taken steps to establish and strengthen the emotional bonds linking him or her with the child." *Id.* at ¶ 21. A parent's conduct determines abandonment, not a parent's subjective intent. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 18 (2000). A parent bears the burden to act as a parent and "should assert [her] legal rights at the first and every opportunity." *Id.* at 251 ¶ 25. When a parent cannot exercise traditional methods to bond with the child, "[s]he must act persistently to establish the relationship however possible and must vigorously assert [her] legal rights to the extent necessary." *Id.* at 250 ¶ 22 (quoting *In re Pima Cnty. Juv. Severance Action No. S–114487*, 179 Ariz. 86, 97 (1994)).

¶14 Reasonable evidence supports the court's finding that clear and convincing evidence did not exist to terminate Mother's parental rights. First, Mother provided reasonable support under the circumstances in sending E.S. a birthday gift of mini cakes, a Christmas card, flowers and teddy bears on Mother's Day, and cookies for Father's Day. *See Kenneth B.*, 226 Ariz. at 37 ¶ 20 (evidence of gifts, clothes, cards, and food helped determine whether mother provided reasonable support under the circumstances).

¶15 Second, after she moved to Florida, evidence showed that she did attempt to maintain regular contact with E.S. through phone calls and emails. The parenting plan entitled Mother to have "telephone, email, text,

Skype or other contact" with E.S. In the social study, Father explained that Mother left 16 voicemails in 19 months, but he did not testify that he helped E.S. return Mother's calls, which was required in their parenting plan. Rather, both parties testified that he blocked her phone number. Mother even testified that she tried calling from other phone numbers but did not get through. Because of this, she contacted E.S. via email. Evidence shows that she sent dozens of emails communicating with E.S., asking Father about E.S., and requesting pictures of her. She wrote messages such as: "Mommy loves you," "Could you kiss Lex and tell her I love her," and "[Father] please do something I want to see my baby." Her emails also demonstrate that she tried to communicate directly to E.S.: "My love will follow you wherever you are!" and "I love you and miss you / Hugs and kisses my love will find you!" While Father sent Mother photos of E.S., he testified that he never relayed Mother's messages to her.

¶16        Third, although Mother has not provided E.S. with "normal supervision," the court properly recognized that her being in Florida made involved parenting difficult, and she would have maintained a stronger relationship with E.S. had she been able to have video and phone contact with her. *See Action No. S–114487*, 179 Ariz. 86, 96 (1994) ("What constitutes reasonable support, regular contact, and normal supervision varies from case to case."). Mother also testified that she received the recommended mental-health services and has become more mentally and financially stable for future parenting time.

¶17        Husband distinguishes this case from *Calvin B.*, arguing that unlike the father there, Mother here did nothing to protect her parental rights. Like the facts in that case, however, Mother showed that Father prevented her from having a normal parental relationship with E.S. The record shows that he deliberately attempted to block her out of E.S.'s life. He blocked her phone number, did not facilitate any calls with Mother after she left voicemails, did not relay any messages or gifts that Mother offered to E.S., and never mentioned Mother in their home. Despite the difficulty of communicating with E.S., Mother continued attempting communication with E.S. via email and gifts. *See Calvin B.*, 232 Ariz. at 297 ¶¶ 22–23 (despite mother's attempts to prevent father from seeing son, reversal of abandonment finding was warranted because father "continued to seek visits," managing about 10 visits a year). Reasonable evidence demonstrates that, like the father in *Calvin B.*, she has "consistently done something to assert [her] right to have contact with [E.S.]," *see id.* at 298 ¶ 29 (internal quotation marks omitted), even if she was not always diligent in pursuing her parental rights, *see id.* at 297 ¶ 25. Where one parent restricts the other parent from interacting with their child, the former cannot then petition to

terminate the latter's rights on abandonment grounds. *Id.* at 297 ¶ 21. Because reasonable evidence supports the juvenile court's finding, the court did not err.

**¶18**        Father also argues that the court should have determined whether termination was in E.S.'s best interests. But a court must consider a child's best interests only after it finds that clear and convincing evidence supports termination of a parent's rights under A.R.S. § 8–533. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 475 ¶ 13 (2022); *see Kent K.*, 210 Ariz. at 285 ¶ 31 (stating that "the focus shifts to the interests of the child" after a parent is found unfit); *see also In re Maricopa Cnty. Juv. Action No. JS-6831*, 155 Ariz. 556, 558 (App. 1988) ("[T]ermination cannot be predicated solely on the best interests of the child."). Because the court did not find a statutory ground to terminate Mother's parental rights, the court was not required to address E.S.'s best interests.

**CONCLUSION**

**¶19**        For the reasons stated, we affirm.

